Filed 6/30/16; second of two modifications; unmodified opinion and first modification attached

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| GRANT SEIBERT, | H040268 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-11-CV204096) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| CITY OF SAN JOSE et al., | |
| Defendants and Appellants. | NO CHANGE IN JUDGMENT |


THE COURT:

It is ordered that the opinion filed on May 31, 2016, be modified as follows:

1. On page 50, first full paragraph, second sentence beginning "Whatever the court's" is deleted and the following sentence is inserted in its place:

> Whatever the court's conclusions, we caution it not to adopt language that could be reasonably understood to constrain the administrative decision maker's discretion upon reconsideration of penalty.


There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____
RUSHING, P.J.

WE CONCUR:


_____
PREMO, J.


_____
GROVER, J.

Filed 6/10/16 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GRANT SEIBERT, | H040268 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-11-CV204096) |
| v. | ORDER MODIFYING OPINION |
| CITY OF SAN JOSE et al., | NO CHANGE IN JUDGMENT |
| Defendants and Appellants. | |

THE COURT:

It is ordered that the opinion filed herein on May 31, 2016, be modified as follows:

1. On the signature page, line 2, the name "MÁRQUEZ, J." is replaced with "PREMO, J." so the signature page reflects the correct panel as follows:

_____
RUSHING, P.J.

WE CONCUR:


_____
PREMO, J.


_____
GROVER, J.

There is no change in judgment.

_____
RUSHING, P.J.

WE CONCUR:

_____
PREMO, J.

_____
GROVER, J.

2

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GRANT SEIBERT, | H040268 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-11-CV204096) |
| v. | |
| CITY OF SAN JOSE et al., | |
| Defendants and Appellants. | |

Plaintiff Grant Seibert petitioned the superior court for a writ of administrative mandamus to set aside a decision by the Civil Service Commission of the City of San Jose (Commission) denying his appeal from a decision by the San Jose Fire Department (Department) to terminate his employment as a firefighter and paramedic. The dismissal was based upon five charges of misconduct, two of which stemmed from his exchange of salacious e-mails during work hours with a 16-year old girl who had visited the station, and three of which stemmed from allegedly improper conduct toward a female coworker. The trial court set aside the Commission's decision on all but one of the charges, and found that charge insufficient to sustain the level of discipline imposed. Both parties have appealed. We hold that (1) the Commission was not deprived of jurisdiction by the belated filing of the notice of discipline on which the challenged dismissal was based; (2) the trial court properly concluded that the e-mail exchange as alleged in one charge, which made no reference to the recipient's age, could not be found to violate any applicable rule or policy; (3) the court permissibly found, on conflicting evidence, that

Seibert lacked actual or constructive knowledge of the recipient's age; (4) the court erred by refusing to consider the contents of interview transcripts which constituted the chief evidence of misconduct toward a female coworker; and (5) the court should have directed that any further administrative proceedings be heard and determined by an administrative law judge.  We will reverse the judgment for further proceedings consistent with our opinion.

## BACKGROUND

### I.    *Salacious E-mails*

On the morning of Thanksgiving Day 2008, a female high school student who lived in the neighborhood of Fire Station 28 brought a cookie pie to the firefighters there.  The girl, to whom we shall refer as "N.C.," was in 10th grade at the time, a few months short of her 17th birthday.  She was given a tour of the station by respondent and cross-appellant Seibert.  At its conclusion he took a picture of her next to a fire engine.  He obtained her e-mail address so that he could send the picture to her.  At 11:00 a.m. he sent her the picture and thanked her for the baked goods, thus commencing the exchange of e-mails that ultimately included the messages underlying the first set of charges here.

On December 15, 2008, N.C. again appeared at the station, this time in the company of two or three male classmates.  Seibert gave the youths a tour of the station.  At least one of them played junior varsity football at their high school, and recognized a photograph of the station supervisor, Captain Leong, who was a varsity football coach at the same school.  He was summoned to greet them.

While at the station, N.C. apparently injured her elbow.  At 2:54 p.m., after she left, she e-mailed Seibert, describing her injury.  This led to an exchange of e-mails over at least a five-hour period, which grew increasingly risqué while playing on the conceit

2

that Seibert might use his paramedic skills to treat the injury (all spelling and punctuation as in original):[1]

| SENDER | TEXT |
|---|---|
| N.C. 2:54 p.m. | thank you so much again for  doing that haha that will definatly give them something to talk about tomorrow and apparently i nailed my elbow sometime i was there (I don't remember how or when) but I nailed it   haha and I got in, my car and i was like hmm..my elbow kinda hurts   and i got home at looked at it and its like all bleeding and bruised   haha i started laughing and I  was like not like this is random or anything!  But yes it was very  good   seeing you  (: |
| Seibert (G.S.) 3:06 p.m.: | That's funny... I don't remember you hitting your elbow on anything ... ???Too bad  your not here, I would take care of you :) It was  good  seeing you too... |
| N.C. 3:34 p.m.: | Haha  oh yeah that's right you're the paramedic of the team there huh? But yea it hurts pretty bad but i don't remember hitting it haha and how would you take care of me?    ;) |
| G.S. 3:38 p.m.: | is it  swollen? |
| N.C. 3:42 p.m.: | i dont think so  maybe a little  bump but it hurts to rest  on it haha but I  have kinda bony arms  im tinyyy |
| G.S. 3:48 p.m.: | sorry....what will make it better ? |

---

[1] An attempt has been made to preserve all spelling and punctuation as well as is permitted by the poor copies in the record.  Many extraneous periods may be artifacts of poor quality photocopying.  Line breaks have been preserved where they appear to serve a literary function.  Some seemingly inadvertent line breaks have been omitted.

| | |
|---|---|
| N.C. 3:52 p.m.: | haha  well you're the  doctor in the house  ;) |
| G.S. 4:59 p.m.: | hmmm.....this is true....I think i would have to do a  hands on  evaluation |
| N.C. 5:10 p.m.: | hmm.. will that help?  cuz I just wanna feel better<br>  and good. |
| G.S. 5:15 p.m.: | I think it might help :) |
| N.C. 5:20 p.m.: | so how do those work? im not sure ive had one from a paramedic before..? |
| G.S. 5:27 p.m.: | I Don't know if I  can/should explain.....is this the 'family' computer ? |
| N.C. 5:31 p.m.: | no its mine  (:<br>and of course you can, a patient should know<br> what a  paramedic is  thinking right? |
| G.S. 5:40 p.m.: | .. well did you say your elbow hurt...<br>so as a paramedic, it is  my job to 'asses'<br>you and try to make you  feel good....<br><br> A good 'hands-on'  assesment begins<br> at the head, and works down  the  body<br>examining every inch  of you  to make<br>sure you are okay... of course the body<br>needs to be  exposed that way I can<br> see all injuries |
| N.C. 5:46 p.m.: | oh really?  hmm.. i think i can do that..   :)<br> so as a firefighter and getting your very  "busy" calls<br> at  3:30 in the morning   do you get  hurt at  all? or do<br>  you have any injuries? |

4

| | |
|---|---|
| G.S. 5:51 p.m.: | some guys can get hurt, this is a physical job, .but luckly [*sic*] I haven't gotten hurt....healthy as a horse :)<br><br>I would have to evaluate you to see how healthy  you are :) |
| N.C. 5:58 p.m.: | oh okay  yea im not sick so thats good but im always willing to do a hands on eval with a cute firefighter :) |
| G.S. 6:42 p.m.: | How do you know you are healthy..??  I Should examine you just to  make sure  I may have to do a very, very  thorough  hands on evaluation... |
| N.C. [no timestamp]: | haha well i know im not like a cough cough  sick but yes i want to be positive im not and to be very veryy thorough I think you might have  to use a "instrument" that some  'paramedics' use right?  but it kinda depends on the paramedic on how big their equipment is |
| G.S. 6:57 p.m.: | you are right....I have a lot of equipment I can use to 'evaluate' you...  we should start by taking your temperature with a 'thermometer' ... |
| N.C. 7:00 p.m.: | yeah that would be good but i think you have to do the  'hands on' my whole body first to start the eval?  then yes my temperature is a must..  then what else is there? |
| G.S. 7:12 p.m.: | So every evaluation does infact start with  a hands on evaluation.. I would start at your head and work my way  down ... first I have to take your blood pressure  then I would have to look at your lips and  mouth...  make sure you have no oral trauma<br><br>Then look at your neck...<br><br>then I have to make sure you are getting equal 'rise and fall' to  your chest, make sure you don't have a  'pneumothorax'... this may  involve exposing your chest (for medical |

5

purposes only)

Then I would have to feel your stomach,
and press in different places
to see if you are 'tender' at all

Then I would have to feel your hips to
make sure there is no pain... this could take a
while to examine this area... I may need to 'poke and
probe' in this area

then after the 'physical' is complete....
then I would take your
temperature for a few minutes..

then I would have you move your body in
different positions to see
how flexible you are and that you have no
sprains..

| | |
|---|---|
| N.C. [no timestamp]: | so for the different positions..i think ill pass that section of the evaluation cuz im pretty flexible ;)<br><br>so then i know that we'll have to use a thermometer to check my temperature in my mouth.. is there any other way or place that you can check that feels good? oh i mean that tell? like maybe a place that's a little more wet than my mouth so your equipment can really make my temperature rise? maybe with a thermometer or..? |
| G.S. 7:31 p.m.: | It all depends on what I find with you.... the more wet you are, the deeper I can probe to evaluate you..<br><br>Also, It is in your favor to be flexible.... that will help during the evaluation a lot.... give me an idea or explain to me, how 'flexible' you are ??<br><br>After probing you, and taking your temperature, I may have some 'medicine' to give to you |
| N.C. 7:34 p.m.: | uhm..being flexible..i can bend over and touch my toes, i can kind of do the splits..im good at doing the butterfly and just laying down on my back and "stretching" but i really like bending over and touching my toes or just |

| | |
|---|---|
| | ```
stretching like that
``` |
| **G.S. 7:43 p.m.:** | ```
I see.... that is a good visual...I can already
picture you
 doing  that – that will make my evaluation easier.. I
can start my
 evaluation from you in several different positions,
and
 can finish my evaluation from behind you. I like
that :)

 I also have some 'medication' for you..
``` |
| **N.C. [no timestamp]:** | ```
so different positions like what?
im willing to try new ones cuz im sure theres plenty i
don't know or havn't done yet in an evaluation..
and how big is your thermometer?
cuz i think i can open my mouth pretty wide to make sure we
get the correct reading..but it may take a few
tries.. and how else can we take my temperature?
``` |

At about this point N.C.'s father entered the room and saw what she was doing. He printed out copies of the messages and went to the fire station, arriving in the late evening. He asked to see the person in charge, who was Captain Leong. Leong described him as appearing "very upset." According to him, the father said, "Your firefighter has been e-mailing my daughter throughout the day, throughout the night. I have a stack of hard copies here of e-mails." He wanted to know the captain's chain of command. "He wanted to call the police department." The captain called his supervisor, the battalion chief, who came to the station to meet with the father. While he was en route, the father went outside to wait, and Captain Leong asked Seibert "what was going on. And I told him that this man is very upset. And he said that you've been e-mailing his daughter, who is only 16 years old. [¶] And at that point he responded, Well, it was mutual." The Captain told Seibert that the father "wants you off the rig. He doesn't want to know that we're coming into his area with you on the rig."

7

As the father later recounted the meeting to the City investigator, he told Captain Leong, "[L]ook I want to put you on notice, I believe you have a predator in your midst. He's had inappropriate contact with my daughter via email and I want that person removed from duty and taken out of the office, something to that extent." He made similar comments to the battalion chief, also telling him "that I would be escalating the matter, he described to me how to do that . . . , [he] said that he would also be making an escalation report the following day." At the time of the father's interview, he reported that the matter had "moved over to the police department," which had started an investigation.[2]

## II.    *Interactions With Coworker*

The then-chief explained that by virtue of the father's charges, the Department "couldn't keep [Seibert] on the line . . . . As a paramedic, they just have too much intimate contact with people . . . ." Therefore, on a date not reflected by the record, he was assigned to the Department's training center. Also assigned to the training center was fellow firefighter Leah Fazio. According to the transcripts of her interview with City's investigator—which the trial court ruled largely inadmissible—Fazio described two incidents in which Seibert touched her in an unwelcome manner and multiple incidents in which he made inappropriate remarks about his or her private life. (See part V, *post*.)

## III.    *Investigation; Proceedings Before Commission*

On February 13, 2009, City notified Seibert that it would be "conducting a personnel investigation" and that he was "considered the subject of the investigation." The Office of Employee Relations retained Morin Jacob, a private attorney specializing in public employment law, to investigate specified "allegations" based on the email

---

[2] No criminal charges were preferred against Seibert.

8

exchange with N.C.  About two months later, she was also asked to investigate Seibert's conduct with respect to Leah Fazio and to "make factual findings pertaining to whether Seibert's conduct resulted in any violation of City policies."  In connection with the two investigations she interviewed Seibert, Fazio, and several other witnesses.  She did not interview N.C., relying instead on a "summary of the recorded interview" conducted by police.

In her report on the e-mail incident, dated August 3, 2009, Jacob found that (1) Seibert had indeed exchanged the e-mails in question with N.C., (2) the evidence was "inconclusive" with respect to whether Seibert knew N.C. was a minor; (3) Seibert did not use city-owned computers to communicate with N.C.; but (4) the exchanges did occur while Seibert was on duty.  She also concluded that Seibert had made statements during the investigation that "either: called his credibility for truthfulness into question, made him appear evasive during this investigation, or that were inconsistent with the statements of his co-workers."  The most consequential of these statements were probably his denial of recollection as to whether he worked on certain dates, his professed inability to recall N.C.'s name, and his professed ignorance that Captain Leong was a football coach at the nearby high school.

In her report on the Leah Fazio incident, dated August 4, 2009, Jacob opined that the Department "may determine that Seibert's actions . . . violated the City's discrimination and harassment policy; that his actions were discourteous to Fazio; and that his actions have discredited the fire department, and impaired the good order and discipline of the department.  It is also a violation of City policy to act in a manner that is detrimental to the public service.  Violation of the fire department rules and regulations is also a violation of City policy.  Finally, it may be determined that Seibert was dishonest during this investigation since he made substantive changes to statements made during

9

his initial interview, or it may be determined that Seibert violated some other policy not mentioned herein."

On November 2, 2009, the fire chief issued an amended notice of discipline based upon six charges: (1) that Seibert "exchanged emails with a female San Jose resident, during work hours, which became sexual in nature"; (2) that he "interacted inappropriately during work hours with the same female noted above, who [he] either knew or should have reasonably known was a minor"; (3) that he "inappropriately touched a female co-worker"; (4) that he "made inappropriate comments to a female co-worker"; (5) that he "enagaged in inappropriate conduct, including, but not limited to, unwelcome attention, and/or leering/staring, towards a female co-worker"; and (6) that he was "dishonest during an administrative investigation and . . . not forthcoming with the investigator on several occasions."[3]

On November 17, 2009, the director of employee relations issued a notice reciting that a "*Skelly* Conference" had been held four days previously "to provide you with an opportunity to respond to the Amended Notice of Intended Discipline . . . , and present any information for consideration before a final determination was made . . . ." (See *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 215.) The notice went on to state that Seibert would be dismissed from his position with the Department effective November 18, 2009. As grounds for this action the notice recited all six charges set out in the amended notice of intended discipline.

On December 3, 2009, counsel for Seibert wrote a letter to the city manager requesting arbitration pursuant to City's policy manual or, failing that, an appeal before

_____

[3] City had apparently issued an initial notice of intended discipline, which we do not find in the record, on September 17, 2009. Questioning of the Director of Employee Relations suggested that the original notice did not include the allegation that Seibert *should have known* N.C.'s age, but only that—as paraphrased by counsel—he "did know that [N.C.] was underage."

10

the Commission. He wrote separately on the same date to the Commission, requesting a hearing "in order to appeal his dismissal."

On May 5, 2011, after taking testimony and receiving documentary evidence, the Commission upheld all of the charges asserted in the notice of discipline except the charge that Seibert had been guilty of dishonesty during the investigation. It sustained Seibert's dismissal based on the remaining charges.

## IV.    *Petition for Writ*

On June 29, 2011, Seibert filed a petition for writ of administrative mandate and other relief in the superior court. As grounds for relief he alleged that (1) the Commission had lacked jurisdiction by virtue of City's failure to file the notice of discipline within the time allotted by a governing ordinance; (2) the Commission failed to provide a fair hearing in several respects, including by "consider[ing] inadmissible evidence"; and (3) the Commission abused its discretion in 20 specified respects. The trial court ultimately issued an amended statement of decision concluding in essence that while there was sufficient evidence to establish the e-mail exchange with N.C. as alleged in the first charge, there was insufficient evidence to establish that this conduct violated any written policy in the absence of actual or constructive knowledge on Seibert's part that he was corresponding with a minor. The court rejected, as less plausible than contrary evidence, the evidence suggesting that Seibert knew or should have known that N.C. was a minor. Nor did the court find the evidence sufficient to establish any of the other charges. In finding the evidence insufficient to establish the charges concerning Leah Fazio, the court noted that she denied any recollection of relevant events in her testimony before the Commission, and largely refused to consider the transcript of her questioning by Investigator Jacob, on the ground that it had not been adequately authenticated. The court concluded that the evidence established, "at worst, inappropriate horseplay subject to admonition or perhaps minimal suspension without pay." The court

11

issued a peremptory writ directing City to set aside Seibert's dismissal and the Commission's decision upholding it and to reconsider these actions in light of the court's decision. City promptly appealed, and Seibert cross-appealed.

## DISCUSSION

### I. Commission's Subject Matter Jurisdiction

At the threshold we address a jurisdictional objection pressed by Seibert in his cross-appeal. He contends that the Commission lacked jurisdiction to proceed against him because the notice of discipline on which his dismissal rested was not filed with the Commission within the time allowed by the governing ordinance. The trial court addressed this subject in the first phase of a bifurcated trial, at the conclusion of which it wrote a careful and thorough statement of decision rejecting Seibert's contention. If this were error, as Seibert insists, it would moot all other questions before us. We have concluded, however, that the trial court did not err.

Seibert's argument rests on San Jose Municipal Code (SJMC) section 3.04.1380B (§ 3.04.1380B), which provides in relevant part that "[n]o disciplinary action of any type or duration shall be valid unless a formal written notice thereof is served upon the employee *and filed with the secretary of the commission* within seventy-two hours of the effective date of the discipline." (Italics added.) Seibert does not deny that the notice here was served on him within the prescribed time. He contends, however, that it was not "filed with the secretary of the commission" within that time; that this rendered the notice void; and that the Commission was thereby deprived of jurisdiction.

For purposes of analysis we will assume that the notice of discipline was not filed in compliance with section 3.04.1380B. The evidence established that the notice was issued on November 17, 2009, stating that Seibert was dismissed from City employment effective the next day, November 18. The notice bore an entry indicating that copies were directed to the Fire Chief, Seibert's personnel file, and "Civil Service Commission."

12

However, there was no evidence of actual receipt by the Commission before December 8, 2009, when a copy of the notice arrived as an attachment to a letter from Seibert's attorney. After taking live testimony on the subject, the trial court found as a fact that the notice "was not filed with the Commission until Dec. 8, 2009," which was some 17 days beyond the 72-hour deadline specified in the ordinance.

Seibert contends that the untimely filing of the notice deprived the Commission of power in the matter, rendering void any action it might take. The trial court found that he was estopped to raise this objection because he failed to do so until after the Commission had acted. As the court observed, Seibert did not object to the timeliness of the proceeding until some 17 months after he had appealed his dismissal to the Commission. During that time the Commission had conducted four hearings in which Seibert participated without objection. He first objected to the untimely filing of the petition in a petition for rehearing filed May 31, 2011.

Seibert contends that he could not be estopped to raise the objection because it went to the Commission's subject matter jurisdiction, a matter that can be raised at any time, and as to which objections cannot be waived or forfeited. We decline to attribute such grave consequences to the filing requirement. First, we question whether it is properly viewed as mandatory, rather than merely directory, for purposes of determining the effect of noncompliance. "[T]he 'directory' or 'mandatory' designation does not refer to whether a particular statutory requirement is 'permissive' or 'obligatory,' but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates." (*Morris v. County of Marin* (1977) 18 Cal.3d 901, 908, limited on another point in *Caldwell v. Montoya* (1995) 10 Cal.4th 972, 987, fn. 8.) "Many statutory provisions which are 'mandatory' in the obligatory sense are accorded only 'directory' effect. . . . The great bulk of the cases which have invoked the

13

doctrine . . . recognize that the 'directory-mandatory' distinction is concerned only with whether a *particular remedy*—invalidation of the ultimate governmental action—is appropriate when a procedural requirement is violated . . . ." (*Id.* at p. 908, fn. 4.) "Time limits are usually deemed to be directory unless the Legislature clearly expresses a contrary intent. [Citation.] 'In ascertaining probable intent, California courts have expressed a variety of tests. In some cases focus has been directed at the likely consequences of holding a particular time limitation mandatory, in an attempt to ascertain whether those consequences would defeat or promote the purpose of the enactment. [Citations.] Other cases have suggested that a time limitation is deemed merely directory "unless a consequence or penalty is provided for failure to do the act within the time commanded." ' [Citation.]" (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1145 [action by state personnel board not invalidated by failure to render decision within statutorily prescribed time].)

We can readily see why failure to give timely *notice* to disciplined employees might be held mandatory in this sense, for without it they cannot defend themselves. But we see no reason to think the requirement of timely *filing* of the notice should be mandatory. The only apparent purpose of the requirement is to allow the Commission to prepare for an administrative appeal by, e.g., opening a file in the matter. If no appeal is filed, we doubt that the Commission's filing of a copy of the notice of discipline has any practical effect or purpose. If the employee does appeal, and the Commission has not previously been notified, it will learn of the appeal when the employee initiates it—as apparently happened here.

For these reasons, we find it difficult to attribute to the filing requirement an importance that would elevate it to the status of "mandatory." A fortiori, we cannot find it "jurisdictional" in the sense necessary to sustain Seibert's argument. Even when a prescribed time limit is "mandatory in the obligatory sense," it " 'does not necessarily

14

mean that a failure to comply with its provisions causes a loss of jurisdiction.' " (*Mt. Holyoke Homes, LP v. California Coastal Com'n* (2008) 167 Cal.App.4th 830, 841 (*Mt. Holyoke*), quoting *California Correctional Peace Officers Assn. v. State Personnel Bd.*, *supra*, 10 Cal.4th at p. 1147.) For these purposes, an act taken without "subject matter jurisdiction" is distinguished from an act taken "without or in excess of jurisdiction." The former exceeds a tribunal's fundamental "power to hear or determine the case," while the latter offends limitations on the manner in which such a power, once present, may be exercised. (*Mt. Holyoke*, *supra*, at pp. 840.) An action taken without subject matter jurisdiction is said to be "void" and subject to invalidation at any time. (*People v. American Contractors Indem. Co.* (2004) 33 Cal.4th 653, 660.) In contrast, an action within the tribunal's subject matter jurisdiction, but "in excess of its jurisdiction" in the broader sense, is said to be only "voidable." (*Id.* at p. 661.) For present purposes, this generally means that a party may become estopped to challenge an action of the second type by failing to lodge a timely, appropriate objection. (*Ibid.*)

Here we are confident that the Commission possessed subject matter jurisdiction over the proceeding. As the governing rules are structured, every disciplinary action commences when the "appointing authority" serves notice of the intended action. (SJMC § 3.04.1380(A)(1).) The discipline takes effect without further action unless the employee files an answer with the Commission within 20 days after service of the notice. (SJMC § 3.04.1390.) It is the employee's answer, not the originating notice, that triggers an "appeal" before the Commission. (SJMC §§ 3.04.1390, 3.04.1400.) "If the employee fails to answer . . . , the disciplinary action taken by the appointing authority shall be final." (SJMC §§ 3.04.1390.) If an answer is filed, "the commission shall hold a hearing" (SJMC § 3.04.1410) after which it may "modif[y] or revoke[]" the challenged action (SJMC § 3.04.1450, subd. (B)).

15

The filing of an answer thus vests the Commission with jurisdiction, i.e., the fundamental power to hear the appeal and to determine the validity of the appointing agency's action. As previously noted, the requirement that the agency's notice of discipline be filed with the Commission seems to serve only a bookkeeping function. This defeats Seibert's attempt to analogize the requirement to that of filing a timely notice of appeal from a judgment of the superior court. Noncompliance with the latter requirement deprives the reviewing court of jurisdiction because timely filing is the triggering event which vests the court with jurisdiction in the first place. Here it is the employee's *answer*, not the agency's notice, that triggers an appeal and thus parallels a notice of appeal in a civil case. The requirement that the agency file the notice of discipline with the Commission has no parallel in appellate procedure. One might hypothesize, for purposes of analysis, an analogous rule directing superior courts to file, in the Court of Appeal, a copy of every judgment they render. If such a rule existed, we doubt that it could be understood or applied to render void any judgment not so filed, or to deprive the reviewing court of the power to entertain an appeal. Indeed, we doubt that it would be seen as "mandatory" in any sense bearing on the validity of either the trial court's or the reviewing court's judgment.

There is no occasion to pursue this thought experiment further, however. It is enough for present purposes to say that the City's failure to file a copy of the notice with the Commission did not deprive the Commission of jurisdiction to entertain Seibert's appeal but at most provided a ground on which Seibert might have been entitled to object to the notice. Assuming this means the disciplinary action was "voidable" on this ground, we readily conclude—along with the trial court—that Seibert's failure to raise the objection at the earliest opportunity barred him from asserting it later. Had the point been seasonably asserted, the City might have cured the defect by issuing a new or amended notice of discipline. Instead the defect was not brought to the City's attention

16

for nearly a year and half, during which time the City and the Commission, as well as Seibert, sank substantial time and resources into an adjudication of the substantive issues raised by Seibert's appeal. It is one thing to belatedly invalidate an official action infected with a non-curable defect of substance. It is quite another to mandate a do-over based on a technical defect that might have been remedied with no prejudice to anyone had it been raised when it first appeared.

Seibert asserts that he cannot fairly be estopped to assert the defect because he himself was ignorant of it until shortly before he raised it in his petition for rehearing before the Commission. The trial court inferred that Seibert learned of the untimely filing of the notice in April 2011, when Seibert, or perhaps his counsel, asked to inspect the Commission's file. He raised the objection in his petition for rehearing filed the following month. As the court observed, the file was a public record and might have been inspected at any time. But estoppel in this context does not require fault on the part of the party to be estopped, or blamelessness on the part of the opposing party. It is less akin to equitable estoppel than to the kind of procedural forfeiture that generally bars an appellant from raising objections that he or she failed to assert in the trial court. (Cf. *Mt. Holyoke*, *supra*, at pp. 843, 844 [comparing doctrine to a defendant's forfeiture of objection to personal jurisdiction by making a general appearance].) Such doctrines rest less on weighing the relative fault of the parties than on allocating the burden of discovering defects whose delayed assertion will entail a substantial but avoidable waste of time and resources. Here Seibert seeks to set at naught the considerable time and effort—and public resources—expended in his administrative appeal, based on a defect that appears to have had no practical consequences at all. The trial court quite properly rejected this attempt.

17

## II.     *Standard of Review*

City's foremost contention is that the trial court failed to accord the Commission's decision the degree of deference to which it was entitled.  Seibert's interest in his public employment status implicated a "fundamental vested right."  (*McMillen v. Civil Service Com.* (1992) 6 Cal.App.4th 125, 129; see *Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494, 500; *Estes v. City of Grover City* (1978) 82 Cal.App.3d 509, 514, citing *Brush v. Los Angeles* (1975) 45 Cal.App.3d 120, 123.)  As a result, the trial court was required to exercise its independent judgment in reviewing the Commission's findings.  (See *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32, 44-45; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143-144.)  The trial court acknowledged this rule, but did not acknowledge the further requirement that it indulge a "strong presumption of correctness" with respect to the Commission's findings, as mandated by *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 808, 817, 819-822 (*Fukuda*).)

In *Fukuda*, *supra*, 20 Cal.4th at pages 823-824, a public employer defended its decision to discipline a police officer by contending, among other things, that the burden was on the employee to establish that the administrative findings were unsound.  The trial court rejected that contention and explicitly placed the burden on the employer to sustain the administrative findings.  (*Id*. at p. 810.)  The Court of Appeal approved that approach, concluding that a presumption of correctness, with the burden of proof on the challenger, was inconsistent with independent review.  (*Id*. at p. 808, see 810.)  The Supreme Court reversed, holding that, properly understood, the trial court was required, despite the independent judgment test, to indulge a strong presumption in favor of the administrative findings and to place the burden on the challenger to rebut those findings.  (*Id.* at p. 817, 825.)

City contends that the trial court failed to apply these principles.  The record on this point is ambiguous.  In the most pertinent passage of its amended statement of

18

decision, the court wrote, "While the Court understands that it should give deference to the Commission, the Court also understands that it is not to use the 'substantial evidence' test. *Strumsky v. San Diego County Employees Association* (1974) 11 Cal.3d 28, 31; *Rigsby v. Civil Service Commission* (1974) 39 Cal.App.3d 696, 700; *Jackson v. Los Angeles* (2003) 111 Cal.App.4th 899, 209; and *Lake v. Civil Service Commission* (1975) 27 Cal.App.3d 224. The Court further understands it is not bound by the factual determinations made by the Commission if it does not believe those factual determinations were accurate or supported by the evidence. *San Dieguito Union School District v. Commission* (1985) 174 Cal.App.3d 1176,1180."

This recital is an accurate statement of law as far as it goes, but the failure to acknowledge *Fukuda*'s "strong presumption of correctness" and allocation of the burden of persuasion is troubling. On the other hand, we ourselves are constrained by the presumption, also acknowledged in *Fukuda*, that "[a] judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 355, p. 409; see *Fukuda*, *supra*, 20 Cal.4th at p. 812, quoting *Drummey v. State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 88 [on otherwise silent record, reviewing court " 'must conclusively presume that the trial court *performed its duty, gave full weight to the presumption of validity of the board's findings, but nevertheless found against the board* . . . . The determination of the trial court on conflicting evidence on the facts is binding on this court on this appeal.' "].) This rule is particularly apt where the complaining party had an ample opportunity to bring deficiencies in the judgment to the trial court's attention, and failed to do so. Here City submitted objections to the court's initial statement of decision. For all presently relevant purposes, that statement was identical to the one ultimately filed. Yet City said nothing in its objections about the court's failure to acknowledge—let alone a supposed

19

failure to apply—the *Fukuda* presumption. Under these circumstances, we must presume that the court properly applied the law and that when it acknowledged its duty of "deference" to the Commission, it was alluding to the *Fukuda* presumption or its functional equivalent.

We need not finally decide the issue, however, for as explained in part V, *post*, we have concluded that it is necessary to reverse the judgment on other grounds. Since this will set the matter at large in the trial court, the court is directed to give due regard to the *Fukuda* presumption in its reconsideration of the issues.

## III.    *Salacious Emails as Misconduct*

The first charge of misconduct set out in the notice of discipline was that Seibert "exchanged emails with a female San Jose resident, during work hours, which became sexual in nature." The notice of discipline alleged that Seibert's conduct in this regard was grounds for discipline under four provisions of the applicable section of the Municipal Code, as well as the City's Code of Ethics, and three provisions of the Department's Rules and Regulations. The Commission sustained the charge, finding that Seibert had violated all of the cited provisions. The trial court concluded that this finding was not supported by substantial evidence.

The cited provisions of the Municipal Code are quite vague, authorizing the City to impose discipline for  "(B) Misconduct," "(D) Failure to satisfactorily perform the duties of his position," "(E) Failure to observe applicable rules and regulations," and "(V) Any other act . . . which is detrimental to the public service." (SJMC, § 3.04.1370.) The cited provisions of the Code of Ethics are, if anything, even less specific, consisting of five pages of, on one hand, broad provisions of an advisory or aspirational character, and on the other, more specific provisions concerning matters of no pertinence here, such as conflicts of interest, acceptance of favors and gifts, and use of confidential information. The Department's Rules and Regulations, if somewhat more specific, seem

20

of doubtful relevance. Section 25.10 enjoins members of the Department to "[b]e courteous and respectful to the public and other [*sic*] with whom they have contact." Section 26.1 provides that "[i]n matters of general conduct, members shall be governed by the ordinary and reasonable rules of behavior observed by law abiding and self-respecting citizens and shall not commit an act, either on or off duty, tending to bring reproach or discredit upon the Department or its members." Section 26.2 provides, "No member shall conduct themselves in a manner, or be a party to, any act which would tend to impair the good order and discipline of the Department."

The City failed to present substantial evidence that any of these provisions would be offended by a private exchange of salacious e-mails between a firefighter and a willing unmarried adult.[4] Its attempts to do so invariably degenerated into circularities, vague generalities, and naked conclusions. Thus City's Director of Employee Relations testified on direct examination that even if Seibert reasonably believed he was corresponding with an adult, "we'd still be terminating [him]." Asked why, he said, "Because the conduct as a representative of the San Jose Fire Department was absolutely reprehensible in our view. I think the fact that we believe that he knew or should have known that she was a minor clearly is worse, but it doesn't excuse the behavior of a San Jose Fire Department employee, who, by the way, is on duty and paid for [a] 24-hour shift. We'd still be facing serious issues with his conduct that occurred while he was a San Jose Fire Department employee." Later asked to specify "what did he violate," the Director managed to speak at length without identifying any specific norm, rule, policy,

---

[4] It bears emphasis that our analysis is confined to the unique working situation of firefighters and may be wholly inapplicable in other contexts. In particular we note that peace officers exercise powers that may warrant a far different approach with respect to their relations with members of the public.

21

or standard that was even arguably implicated by the challenged conduct.[5]  Still later the presiding officer asked him "what policies are violated by a firefighter engaging in sexual consultation or sexual conversations with consenting adults, the two adults are consenting.  What policy?"  The witness replied, "the ones that are listed here," meaning those listed in the notice of discipline.  The officer again asked him to "please give the policies," in response to which the witness merely cited the list of provisions set forth in the notice.

Similarly, the fire chief at the time of Seibert's discharge testified, "With the girl being a minor makes it even a more egregious offense.  Whether it was a minor or not, it's a citizen that you're having inappropriate contact with while on duty. . . .  [Sixteen] or not, still the actions are egregious enough for termination."  He made no attempt to explain how the "contact" was "inappropriate," or what was "egregious" about it, apart from the age of the other participant.  When asked to explain his recommendation that Seibert be fired, he testified, "When you're on duty, you're held to a higher standard.  You're being paid by the City to perform your duties and the rules and regulations also

---

[5]"Q.  Now, if you didn't charge him with a violation of the email or computer policy, what did he—what did he violate?

"A.  Several things.  I would say first and foremost, the City's code of ethics where City employees in their conduct, in their work and personal affairs should be beyond reproach.  *I think you can look at the code of ethics and know the sections that would be implicated there.  We can talk about that further.*  Departmental policies that talk about not bringing discredit to the fire department and to the City through someone's conduct.  The Municipal Code, which I think there's a Municipal code section—I think it's very important to keep in mind here, it says you can discipline someone for any other act, either during or outside of duty hours, which is detrimental to the public service.

"We believe that Mr. Seibert's interactions with [N.C.] in those email exchanges are absolutely detrimental to the public service.  It brings tremendous discredit to the San Jose Fire Department and to the City and absolutely merits his cause for discipline and termination from the City."

22

have some things in there that your work will be related towards the betterment of the department, those kinds of things."

The only hint of impropriety in this testimony is that when he engaged in the e-mail exchange, Seibert was "on duty" and thus should have been devoting his time to "the betterment of the department" rather than indulging in private communications. But if this was a genuine standard of conduct, the evidence here suggests that every firefighter in San Jose openly flouts it without consequence. As the trial court correctly observed, "The testimony was overwhelmingly clear that on-duty firefighters are allowed to bring their own personal computers to the firehouse. They pay for their own wi-fi service, and they may communicate by computer or by using the public telephone box with whomever they want, whenever they want, about any subject they want while on duty." In a footnote the court added, "There was testimony that the use of the internet was in many ways no different than the use of the public telephone at the firehouse. Firefighters were allowed the same freedom of expression and there was no suspension of their communications of any kind."[6]

Indeed, if anything this summary understates the extent to which firefighters were free to pursue their own interests when not called upon to perform official duties. Battalion Chief Sapien stated in his interview that firefighters are allowed to bring personal computers and cell phones to work. While city policies forbade using city-owned computers for anything but city business, there was no policy governing use of personal computers. So long as their use did not interfere with city or department business, firefighters were free to use them for personal purposes. Fire Captain Lovens

---

[6] The references to firefighters' use of a "public telephone box" and "public telephone" apparently rest on testimony by Captain Lovens that firehouses "have phone booths where you can go into, where you close the door, it's quiet and you can speak to somebody in privacy."

likewise testified that firefighters were free to use their computers for all kinds of personal activities, including "personal emails." He did not understand such activities to offend any department policy. He acknowledged having exchanged e-mails, as well as communicating in text and voice via social media, with people he might be dating, or with whom he might be in a romantic relationship. If such a communication were to become sexual in nature, it would not violate any department policy of which he was aware.[7] Similarly, according to the police report, Captain Leong told an investigating officer that there were two classes of computers in use at the station—one "designated for city use only," and "also a wireless system so the fire fighters could use their personal laptop or computer devices." Leong testified that while there is a "very strict" policy limiting the city's computers to "work-related issues," he was aware of no written Department policy restricting "use of personal computers in the firehouse." Nor was he aware of any such policy concerning "what type of content is appropriate to be sent" via personal computers.

Seibert himself testified without contradiction that "[e]verybody" in a firehouse is "wifi'ing" on a laptop: "People are on their computers, they're doing online banking, they're on eharmony.com, they're doing online dating, checking vacations. I mean you have hours [i.e., of idle time] . . . . Guys are sitting on the co[u]ches in front of the TV

---

[7] In his investigatory interview, Lovens described the policy, or absence of one, in even broader terms: "I don't believe there is a policy. I would think it would fall under the harassment/discrimination policy that, you know, would be like, obviously anything on the computer pornography-related or adult-material-wise would have to be kept within the confines of your personal space. Now there's currently a gray area regarding that. I mean, obviously there's Supreme Court rulings based on what your personal space is and what you can have, a[n]d our department has said that there is maybe a higher standard than that, and that's kind of up in the air. But, my general understanding is that you keep it, whatever you have, as long as it's in your personal space, it should be fine."

and everybody has their computers and talking and streaming from Netflix movies, they got their earplugs in and then when the lights and the tones go off, people put their computers [down] and get to the rig. Some of the newer firehouses have individual bedrooms and sometimes people go to their bedrooms, close their door, they could be in there all day sleeping and then, eventually, we get a call and they come out of their bedroom."

Indeed, far from prohibiting personal communications during work hours, the Department's "Routine Operation Policies and Procedures" governing "Station Routine" expressly authorized on-duty firefighters to (1) make and receive calls using their own private telephones, and (2) use "[w]ireless and electronic and computer devices," specifically including cellular phones and laptop computers. The policy stated three limitations on such use, the most nearly pertinent of which states, "Personal electronic devices that represent a *distraction from the employee's assigned duties* shall not be permitted. All personnel are responsible for ensuring that personal electronic devices do not *negatively impact departmental operations or services* to the public." (Italics added.) On its face all this means is that firefighters must not allow the use of a telephone or laptop to interfere with doing their jobs.

City made no attempt to show that Seibert's exchange of emails, at the time it occurred, had any effect on his work. Indeed the Director acknowledged that interference with the performance of his duties played no part in the case: "It wasn't an issue that we believe was relevant in this particular issue. In other words, it didn't come up that, for example, he didn't go on a call because he was busy emailing. Obviously, we would have taken that into account if that were a fact here, but we didn't hear any facts that related to his not going on a call." At the same time, while he declined to frankly acknowledge that interspousal communications would not trigger disciplinary action, he

25

was unable to "think of a case where we've disciplined a husband or a wife in email conversations that occurred on somebody's smartphone or something else."

The nearest thing to a rule or policy against exchanges of the type at issue here is a memorandum from the fire chief concerning the use of social networking sites. It stated, most pertinently that "[m]embers should also be reminded that accessing social networking sites for personal use while on-duty is a violation of Rules and Regulations Sections 26.1 through 26.7, which *prohibits employees from devoting any on-duty time to any activity that doesn't relate to Fire Department functions*. While our 56-hour work schedules allow for down time, when on paid time our activities should support the Department's Mission 'To serve the community by protecting life, property, and the environment through prevention and response.' " (Italics added.)

For at least two reasons, this document does not support a finding that Seibert's conduct offended any existing rule or policy. First, it was not promulgated until April 2010, some 16 months after the email exchange at issue here. Second, the quoted language flatly contradicts both the "Station Routine" document and the testimony—*all* of the testimony—as to how firefighters actually conducted themselves, and were expected and permitted to conduct themselves, while on duty. When Captain Lovens was specifically asked about this memorandum, and the language implying that all on-duty time must be devoted to the interests of the Department, he first observed that the memo's distinction between e-mail and social network sites was "quite vague" since the latter can be used to transmit messages that are functionally indistinguishable from e-mail. He then continued, "[T]he next line . . . prohibits employees from devoting the on-duty time to any activity that doesn't relate to the fire department. Well, we watch TV, we rent movies, so in that case, we've been violating this policy for years and we're violating it every day the moment we turn the news on and watch a news program and not dedicate our time to the fire department, so it's really a gray area." He explained

26

further, "[W]e work for 24-, sometimes-, 48-, 72-hour shifts and it's a matter of people need to take care of their business. If their business is taken care of, whether it be checking out the rig, the cleaning assignments, whatever, if they want to make a personal phone call or take care of a laptop issue or make a—shoot an email or even unwind with a little training video while we're waiting for lunch, it's not—it's not a problem and I don't think it's a problem for any crews as long as it doesn't affect the readiness of the crew.  The readiness of the crew is what's imperative."[8]

The Commission's finding of misconduct cannot be sustained on the basis of an overbroad admonition which was promulgated a year and half after the conduct at issue, which contradicts other written policies, and which is routinely honored in the breach by the entire firefighting force.

The City attempted to establish that two other aspects of Seibert's conduct warranted discipline.  One is that the exchange grew out of a contact that Seibert had made in the course of his duties.  But as the trial court noted, the employee relations director "admitted [that] the fire department has no specific written policy prohibiting firefighters from developing social contacts as a result of official on-duty contacts."[9] When Captain Lovens was questioned on this point, he found nothing objectionable about it.  He said there had "definitely" been situations in which he "met someone through the firehouse and . . . then subsequently engaged in ongoing communications via

---

**8** Even the Director acknowledged that firefighters "do have a unique workplace": "Remember, when you're on a 24-hour shift, they have downtime, specific downtime where there's not a call or they're not doing station duties."  Captain Lovens testified that Fire Station 28, where the events here arose, "is probably the slowest engineer [*sic*] in the city, so the amount of time spent on work-related stuff is pretty minor. . . .  I mean one call a day, we're lucky, so a much larger portion of available downtime."

**9** He also acknowledged that Seibert's conduct did not violate City's computer use policy, which was concerned only with city-owned computers.

email" or otherwise. The examples he cited seemed particularly innocuous—handing his business card to people and then communicating with them in his role as "liaison for the San Jose Fire Museum." He did not think he had ever given out his card "to a female . . . as a date," but he went on to opine that he did not think it would be "inappropriate" to do so "in the right situation." This was substantial evidence from which the trial court could conclude that there was no policy, written or otherwise, against engaging in social contacts with persons "met . . . through the firehouse." We see no evidence to the contrary, notwithstanding the director's apparent belief that it was intrinsically objectionable.

The director also suggested that the e-mail exchange warranted discipline because it consisted of sexual double entendres centered on Seibert's status as a paramedic. Asked to explain how a private off-color e-mail exchange could violate the policies cited in the notice of discipline, the director replied, "[T]hese email exchanges were being sent to a citizen where Mr. Seibert is *clearly identifying himself as a member of the fire department*. That's what it talks about, talks about when he's on duty, when he's not on duty, plus *the emails that became sexual were about his role as a paramedic and conducting examinations*. So he's talking about how he conducts—you conduct examinations and then it keeps going and becomes sexual and he engages in that email communication. You read those emails and you see, this is not just some separate communication with your girlfriend or your significant other. Here, *he's talking about his role as a firefighter/paramedic and starts to get into a sexual exchange with her about examinations and what you would probe and all of those things*. You have to take the context to understand and I believe if you take that context, I think a reasonable person would understand why that is absolutely a discredit to the San Jose Fire Department and why we believe Mr. Seibert should be terminated for it." (Italics added.)

28

Under cross-examination, Seibert did not deny that the exchange involved "sexualizing the things you do as a paramedic and putting them in some sort of sexual context." He acknowledged having taken his "role as a paramedic, a San Jose paramedic and turn[ed] it into a sexual thing with somebody who is a member of the public." But the trial court was entitled to find the evidence before the Commission insufficient to establish that this characteristic increased the likelihood or extent to which the exchange threatened to bring discredit upon the Department or City.

We thus find no fault in the trial court's conclusion that the evidence was insufficient to establish that the conduct described in Charge 1 offended any existing rule or policy. We note, however, that the trial court nonetheless *sustained* this charge, while finding it insufficient to warrant dismissal, on the ground that that Seibert's conduct created a "risk of embarrassment to the City" which "support[ed] some progressive disciplinary action." It may well be that indiscriminate exchanges of salacious messages with *relative strangers* on company time creates an undue risk of embarrassment or even scandal. Indeed this case illustrates the danger. Assuming Seibert believed his correspondent to be a young adult, the fact is that *he did not know* and that, as it turned out, she was legally a child. Seibert was not prosecuted, but he was investigated, for what would be widely considered an extremely odious offense. We have no doubt, in short, that policies restricting such exchanges would be in order. We remain uncertain, however, that in the absence of such a policy, an abstract "risk of embarrassment" furnishes a ground for discipline. However the parties have not distinctly addressed this aspect of the trial court's judgment. Since we are reversing on other grounds, the court may elect to revisit this issue on remand.

## IV. *Salacious Exchange with Minor*

The Commission's second finding of misconduct was that Seibert "interacted inappropriately during work hours with a female, whom he either *knew or should have*

29

*reasonably known was a minor.*"  (Italics added.)  The trial court rejected this theory, implicitly finding the evidence insufficient to establish that Seibert possessed actual or constructive knowledge of the minor's age.

We have little doubt that a firefighter-paramedic's exchange of sexually charged messages with a minor can expose the Department to disrepute.  Here, when the minor's father learned of the exchange he concluded that Seibert was a "predator" who could not be trusted in dealing with members of the public.  No doubt many members of the public would share that view.  And in view of the risk of creating such mistrust, we have no doubt that firefighters and other public servants can and should be held to a high standard when they engage in personal contact of any kind with persons who *may* be minors.  Conceivably Seibert could have been disciplined for *failing to ascertain* whether the young person with whom he was communicating was an adult.  As he acknowledged before the Commission, he "could have exercised a little bit more diligence checking out [N.C.]'s age."  A person in his position might well be charged with a *duty of inquiry*, lest he or she inadvertently jeopardize the Department's relations with the public.  But that is not how the charge against him was framed.  It was based on the allegation that he actually *knew*, or in light of evidence before him should have *known*, that she was in fact a minor.

The evidence on this point was sharply conflicted.  The Department's theory was that N.C. openly disclosed her true age in Seibert's presence, and that even if she had not, circumstantial evidence should have led him to realize that she was attending high school and therefore probably under 18.  The evidence was certainly sufficient to sustain this view.  N.C. testified that when she originally visited the station on November 27, 2008, she exchanged small talk with the firefighters.  They asked where she went to school, and she named a local high school, saying she was a junior there and played on the volleyball team.  At some point she told them that she was 16 years old, to which "[s]ome of the

30

guys . . . joked, Oh, you don't look that old." She was unsure whether they meant she looked older or younger. During this conversation Seibert was "[i]n the general area." She also testified that when Seibert showed her around the station he did not ask any questions about whether she worked or went to college, as might be expected if he believed her to be a young adult. Further, she testified, when she returned to the station on December 15, Seibert asked her if she was studying for the SAT, i.e., the Scholastic Aptitude Test, which is taken by high school juniors in anticipation of applying for admission to college.

However, no other witness reported hearing N.C. mention high school, say she was a junior, or state her age as 16. Seibert testified that, on the contrary, she represented her age as 18. This was corroborated by fellow firefighter Gonzalez, who described an exchange in which Captain Cruz alluded to the possibility of the young visitor going out drinking with her friends after Thanksgiving dinner, to which she replied that she was not old enough; when asked her age, she said "I'm only 18." To be sure, some doubt was cast on Gonzalez's recollection by statements in the police report, attributed to Captain Cruz, to the effect that a second young visitor had come to the fire station that afternoon. According to Cruz—who had retired at the time of the appeal hearing, and did not testify—Seibert introduced this second visitor as his girlfriend, and it was she with whom Cruz then had the conversation about drinking and age. Gonzalez had no recollection of a second visitor.[10] However he placed the visit he recalled in the early afternoon, whereas the record leaves little doubt that N.C. had come to the station in mid-morning.[11]

---

[10] The fourth member of the fire crew that day, Jessie Corria, told the investigating officer that there he recalled two visitors and thought that both had brought baked goods for the firefighters.

[11] Most conclusively, Seibert's initial e-mail to N.C. bears a timestamp of 11:00 a.m. on November 27. Presumably it was this message to which he attached the photo of her next to a fire engine. In it he thanks her for the cookie-pie, which he reports as "almost 1/2 gone."

City contended that further notice of N.C.'s real age was imparted by her second visit to the station, on December 15, 2008. It is undisputed that she was accompanied by two or three male schoolmates, one of whom was on the junior varsity football team, and that Captain Leong was summoned to greet them when one of the visitors recognized him from a photograph on the wall as a football coach at their high school. The evidence was equivocal, however, as to how much of this information was known to Seibert. In his interview he acknowledged hearing one of the male visitors make some reference to "high school" and a "coach," but he "didn't pay attention to it" and could not say "if that was a current thing or something in the past or someone had a brother . . . ." In testimony before the Commission he acknowledged only overhearing a reference to a coach, after which the visitors indicated that they knew Captain Leong, whereupon Seibert called Leong, who came and greeted them. He denied knowing, at the time, that Leong was a high school football coach. City attempted to impeach this testimony, particularly with earlier statements by Firefighter Lovens that "anyone within the department" would know of Leong's involvement in coaching.

City also alluded to N.C.'s physical appearance as more consistent with minority than majority. However the evidence on this point, too, was highly equivocal. By the time commissioners saw her, the events in question were nearly two years past. The nearest thing to evidence of her actual appearance at that earlier time is the interview of Captain Leong, in which he opined that he would think Seibert knew she was a high school student because she and her companions "seemed like [h]igh [s]chool [s]tudents." More specifically, Leong assumed N.C. was a high school student because she "[l]ooked like a high school student." However N.C. herself raised doubt about how mature she looked, saying that when she told firefighters her age and they said she didn't look it, she was unsure whether they meant she looked older or younger. Moreover Seibert testified not implausibly that she seemed unusually "confident" for a minor.

32

It also bears noting that not all high school students are minors. Most students reach the age of majority sometime in their senior year. This magnifies the relevance of N.C.'s testimony that she had not only told firefighters her age but also that she was a junior in high school, which would ordinarily make her 16 or 17 years old. She also said that Seibert had asked if she was studying for the SATs, which would suggest that he knew she was a junior, since that is when they are generally taken, and he as a college graduate would likely know this. However, Seibert gave a very different account of this conversation, or one on this topic, stating that N.C. told him she had already taken the SATs, had done very well on them, and was contemplating a "transfer" to a new college.

Various other circumstances were cited on both sides as tending to show either that Seibert should, or should not, have known N.C. was under the age of majority. For instance, Seibert said that N.C.'s seemingly irregular schedule suggested that she was in college, as did her references to a "dead week" to prepare for final exams. Rather than attempt to catalog the evidence further, however, we will simply observe that ample evidence would support a finding either that Seibert should have known, and perhaps did know, that N.C. was a minor; or that he justifiably supposed her to be older. This brings into sharp relief the *standard of review*, previously discussed. As we noted there, we must presume that the trial court applied the correct standard and we must uphold those findings insofar as they are supported by substantial evidence. Since they are, we cannot say that the court erred in finding that the weight of the evidence did not sustain the second charge. Again, however, it will be open to the court on remand to reconsider these questions, applying the "strong presumption" of correctness mandated by *Fukuda*, *supra*, 20 Cal.4th at page 808.

33

## V.  *Improper Conduct Toward Co-Worker*

### A.  *Background*

#### 1.  Testimony Before Commission

The third through fifth counts of misconduct, which the Commission sustained, charged that Seibert (1) "inappropriately touched a female coworker," (2) "made inappropriate comments to a female coworker," and (3) "engaged in inappropriate conduct, including, but not limited to unwelcome attention, and/or leering/staring, towards a female coworker."  The charges appear to be based on transcripts of interviews of the affected coworker, Leah Fazio, conducted by the Department's investigator, Morin Jacob.  When Fazio testified before the Commission, however, she professed not to recall the incidents described in the transcripts, or her own statements describing those incidents.  To analyze the ensuing evidentiary issues it is necessary to recapitulate her testimony in some detail.

At the outset of her testimony Fazio professed not to recall having any "problems" or "concerns" involving Seibert.  She remembered being interviewed by an investigator, but said she did not recall anything she said at that time.  She testified, however, that she told the investigator the truth.

When the questioning turned to specific incidents, it tended to follow a pattern in which Fazio denied any memory of the incident, denied remembering having told the investigator about it, acknowledged that she must have done so, and affirmed that she had told the investigator the truth.  First she professed not to recall telling the investigator that Seibert had inappropriately touched her.  She was then asked to read to herself a portion of the transcript in which she appeared to tell the investigator that on her first day at the training center, where she and Seibert worked together, he came up behind her and— despite their scarcely knowing each other—poked her on both sides of her waist with his index fingers.  After she denied that the transcript had refreshed her recollection

34

regarding such an incident, the following exchange occurred: "Q Is there any reason for you to doubt that what you said on that date to the investigator is not [*sic*] true? [¶] A No. *If it's here, then it's clear that I said it.* [¶] Q And were you telling the truth on that date to the investigator? [¶] A *I was telling the truth* on that day to the investigator, yes." Asked whether she "believe[d]" the described events took place, she again denied any memory of "what happened at the training center." This led to the following exchange: "Q That's not my question. If that's what you said on the day that you were interviewed by the investigator, do you have any reason to believe that's incorrect? [¶] A No. [¶] Q So is that—based on that, *would you believe that that's what happened* on the day that you indicated you first came to the training center? [¶] A *Well, yeah.* [¶] Q Yes or no? [¶] A Yes." (Italics added.)

After she denied recalling "any other physical contact" with Seibert at the training center, she was asked to review a transcript passage describing an incident in which Seibert came up behind her while she was sitting at a computer, grabbed her ponytail, twisted it around his finger, and "made, kind of like a ooooh (high pitch)" sound. Again she acknowledged that she made the statements attributed to her, adding, "That's what's indicated here." Again she affirmed that she was telling the truth to the investigator. She acknowledged having no "reason to doubt what you stated to the investigator on that date."

Fazio next denied recalling any occasions on which Seibert "ma[de] any inappropriate comments" to her. She was presented with a transcript passage in which she had described Seibert's tendency to "openly talk[] about his sex life," including "his personal sex life with younger girls," which she had then amended to say, "he didn't actually say the word, I'm having sex with younger women. . . . He just said, I love being[12] younger girls, they're great and they're hot, and they're beautiful and I love their

---

[12]  *Sic*; presumably, "being with."

you know, all this and that about, he was . . . ." (Last ellipsis in original.) Asked if this was said in her presence, she reportedly said, "Yeah. He said it probably two or three times in my presence. Hey can you get me a young girl? Can you get me someone? I'm looking for 25 and younger you know?" Again she denied, in her testimony, any "reason to doubt that this is what took place," adding, "Not if it's indicated here."

Next Fazio was asked whether Seibert "pester[ed]" her or gave her unwelcome attention at the training center. After she professed a lack of memory, she was asked to read a transcript passage describing persistent questioning by Seibert, despite repeated requests by her to desist, about her private life and that of her Los Angeles boyfriend. Asked if she had made statements to the investigator to that effect, she replied, "According to this, that is correct," and acknowledged having no "reason to doubt [*sic*] that what [she] stated on that day to the investigator is incorrect [*sic*] in any way."

She was then asked a series of questions about her attitude toward Seibert and toward the proceeding. She said that she was testifying "under duress," i.e., "threats of insubordination from you guys for not showing up. I had nothing against Mr. Seibert, okay? I look forward to working with him. You can put him in a fire engine tomorrow, and everything will be fine. I have nothing bad to say about him."

Finally she was asked if Seibert had contacted her "after the investigation began in this case." She replied, "No. He never contacted me. He never tried to talk to me. I never saw him. I never spoke to him." She could be understood to impliedly acknowledge that he had left a message on her voicemail, but offered that it "wasn't for me," that her phone "doesn't have a personal greeting, so it could have been for anybody," and that she herself had "left erroneous voice messages before for other people. It's not a big deal." She had also received at least one text message from him, "[b]ut it was not directed to me, so it didn't bother me." Asked if it was her testimony that neither the voicemail nor the text messaging bothered her, she replied, "My

36

testimony is nothing about Grant Seibert bothers me." She also denied ever being intimidated by Seibert or "get[ting] the indication that he was going around saying that you're the result [*sic*] of his termination."

On cross-examination, Seibert's attorney also asked Fazio "a couple of questions based on what you told the investigator." First he asked whether Seibert had ever asked her out on a date, while showing her a corresponding page from the transcript. She answered, "Not that I remember. And it says no, so . . . ." (Ellipsis in original.) Counsel then asked whether Seibert "ever ma[d]e any sexual advances towards you," to which she replied, "Not that I remember. I'm not sure what I answered. No. [¶] Q At Line 23. [¶] A Yeah. I answered no."

On redirect Fazio acknowledged statements in the transcript to the effect that after her first week at the training center, she was "uncomfortable" around Seibert "every time I saw him" and that he was a "major distraction" who "made it unbearable to come to work" because he was "way too much in my space." She noted her further comments to the investigator, however, that "I never really wanted to report any of this. I never wanted an investigation. I just wanted him removed."

Thereafter the witness was questioned by members of the Commission, including the presiding officer, who elicited the following testimony: "Q Ms. Fazio, is—in your opinion, having reviewed the report by the investigator, is that—*did the investigator accurately report your interview?* [¶] A *I believe so.* I have no reason to say why they wouldn't report it the way it was. [¶] Q But what they wrote you feel was accurate, what the conversation between the two of you? [¶] A Yeah. I don't remember the conversation, so this is all I have to go on. Yes. *I believe it's accurate.*" (Italics added.)

At the conclusion of his initial questioning, City's attorney asked that Fazio remain "subject to recall for future purposes if necessary." After the Commissioners

37

finished their questioning, the presiding officer instructed her that she was dismissed subject to recall.

## 2. Trial Court Treatment

The trial court found the evidence before the Commission insufficient to support the charges concerning Seibert's conduct toward Fazio. In its amended statement of decision the court wrote that it "did not . . . consider the transcripts of the audio recordings and witness interviews conducted by the City's investigator aside from those portions used to impeach witnesses pursuant to Evidence Code section 770." The court's only explanation for this treatment appears in a subsequent footnote: "The only charging evidence offered was the alleged transcript of what Firefighter Fazio had reported to the City's investigator. That transcript was never authenticated; the underlying tapes were not made part of the record. There was insufficient authentication to allow that document into evidence. [¶] At the administrative hearings, Ms. Fazio testified that she did not remember any concerns about Mr. Siebert's behavior (243:4-23), and she denied any memory of what she may have said to the investigator (244:9-12). She also didn't find having the transcript read to her refreshed her recollection (245:15-248:22). As a result, the transcript testimony fails under both Evidence Code § 403 and Evidence Code § 770."

### B. Authentication

The trial court cited two code sections. The first, Evidence Code section 403, does not state a ground for the exclusion of evidence. Rather it describes the procedure by which preliminary facts—i.e., facts on whose existence the admissibility of other evidence depends—are to be established. Since the court also referred to the absence of authentication, we infer that the reference to Evidence Code section 403 meant that the court found an absence of evidence "sufficient to establish" that the Fazio transcript was "the writing that the proponent of the evidence claims it is." (Evid. Code, § 1400,

38

subd. (a).) As discussed in greater detail below, the reference to Evidence Code section 770 (§ 770) apparently reflects a determination that City failed to establish admissibility of the transcripts as prior inconsistent statements; this suggests that the court excluded the transcripts as inadmissible hearsay. None of these grounds of exclusion can be sustained.

Seibert forfeited any objection he might have had that the transcripts lacked authentication. So far as we can determine, no such objection was ever lodged before the Commission. Seibert's first suggestion of any such deficiency was made at the oral hearing *in the trial court* on his petition for administrative mandamus. His brief implies otherwise, stating that he "*again* set forth the authentication issue" in his "Reply to the City's Opposition to Findings." (Italics added.) The "again" is perplexing because no earlier "set[ting] forth [of] the authentication issue" is alluded to in the brief, and none appears in the record. Further, the record contains no document by the stated title, and the accompanying record citation leads to *City's* opposition to the *petition for administrative mandamus*. Seibert may have intended to refer to his "reply to respondent's opposition"; but that document contains only a passing allusion to hearsay, and no mention of inadequate authentication. Further, it too was filed in the trial court, long after the Commission had concluded its proceeding, during which—so far as this record shows—Seibert gave no hint of any objection to the interview transcripts except for a very late claim of hearsay, which we discuss in the following section. Indeed, counsel for Seibert himself treated the transcripts as authentic and accurate, using them, in his cross-examination of Fazio, to establish points favorable to his client.

It is of course a familiar rule that a finding may not be challenged based on erroneously admitted evidence unless the record contains "an objection to or a motion to exclude or to strike the evidence that was *timely made* and so stated as to make clear the *specific ground* of the objection or motion." (Evid. Code, § 353, subd. (a); italics added.) This rule has long been held to bar belated claims that documentary evidence was

39

inadequately authenticated. (See, e.g., *Interinsurance Exchange v. Velji* (1975) 44 Cal.App.3d 310, 317-318; *Kelley v. Bailey* (1961) 189 Cal.App.2d 728, 735-736; *Attebury v. Wayland* (1946) 73 Cal.App.2d 1, 4.) The most apposite precedent may be *People v. Sims* (1993) 5 Cal.4th 405, 448, where the defendant was held to have forfeited a lack-of-authentication objection to a transcript of a recorded interview. (See also *People v. Williams* (1997) 16 Cal.4th 635, 661-662 [defendant forfeited authentication objection to tape recording]; *People v. Hines* (1997) 15 Cal.4th 997, 1045, fn. 7 [same; if defendant believed foundation for tape recording was inadequate, "it was incumbent upon him to bring the matter to the attention of the trial court, and he may not raise the issue for the first time on appeal"].)

Application of this rule is most appropriate where it appears that a timely objection would have permitted the proponent of the challenged evidence to cure the deficiency. (See *Coy v. Superior Court of Los Angeles County* (1959) 51 Cal.2d 471, 473 [rejecting belated contention that officer's testimony should have been excluded based on failure to identify confidential informant; prosecution "was entitled to an opportunity to produce [other] evidence or waive nondisclosure," but "was not called upon to do so . . . while evidence of reasonable cause stood unchallenged in the record"]; *People v. Rogers* (1978) 21 Cal.3d 542, 548 [allowing late objection "would deprive the People of the opportunity to cure the defect at trial"].) Here the gist of the objection was that City had failed to adduce evidence that the contents of the transcripts corresponded to what Fazio had actually told the investigator. Had that objection been raised while the matter was pending before the Commission, the City could readily have cured it by various methods including calling the transcriber to testify, submitting the recordings themselves into evidence, or—most easily—by asking the investigator to attest that the transcripts

40

conformed to the interviews she had conducted.[13] To permit a party to pounce upon the lack of such evidence after it is far too late for the proponent to supply the missing testimony would encourage sharp tactics and inevitably lead to greater expenditures of time and resources in reaching a final and just result.[14] We therefore conclude that Seibert forfeited his authentication objection by failing to raise it before the Commission, and that the trial court erred by excluding the transcripts on this ground.

[13] Indeed the investigator's testimony may well have been sufficient to authenticate the transcript. As part of a general account of her methodology, she testified, "I interviewed those witnesses. The witness interviews were all recorded and transcribed . . . . [A]t the conclusion of all of the witness interviews, I prepared this report. I provided the city with a copy of the report and a copy of all the transcripts. In preparing my report, I reviewed all of the transcripts . . . and I tried to cite and reference the transcript to support what is in the report." She testified that the transcripts were generated either by a staff member in her office or by a court reporting agency. Asked if she had any reason to believe that the transcripts "in any way did not reflect what actually occurred at the interview," she replied, "No." To be sure, a more solid foundation would have been provided by framing the last-cited question in the affirmative rather than the negative, i.e., having reviewed the transcripts, did she find that they accurately reflected the questions asked and the answers given. But particularly in the absence of an objection, or a serious question about accuracy, the cited testimony was probably sufficient.

[14] Seibert asserts that City "knew of this [authentication] issue prior to the filing of the Petition for Writ of Mandate," but he offers no supporting citation to the record, as required by California Rules of Court, rule 8.204(a)(1)(C). Again, so far as we can determine, he first asserted an authentication objection at the *hearing* on the writ petition. Seibert goes on to claim that given its supposed advance knowledge of the objection, City "could have made a request [i.e., to the trial court] to augment the record with evidence to authenticate the transcripts." But the court was authorized to admit only such new evidence as "could not have been produced or . . . was improperly excluded at the hearing" before the Commission. (Code Civ. Proc., § 1094.5, subd. (e).) Presumably any evidence City might have offered on this subject "could . . . have been produced" before the Commission had City been aware of the need for it.

41

*C. Hearsay*

**1. Background**

The court's error in sustaining the authentication objection would of course be harmless if the interview transcripts were properly excluded on another ground. However the only other objection Seibert presses on appeal is that the transcripts constituted hearsay. This objection was asserted, albeit belatedly, before the Commission: on the day of its last hearing in the matter, Seibert's counsel submitted a motion via e-mail to dismiss the charges involving Firefighter Fazio on the ground that they were supported only by the transcript of her interview, which was hearsay. He reiterated the objection two months later in a petition for rehearing. The Commission overruled the objection, at least impliedly. (See *Clopton v. Clopton* (1912) 162 Cal. 27, 32; 3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 399, p. 556; *People v. Flores* (1979) 92 Cal.App.3d 461, 466; *People v. Jacobs* (1987) 195 Cal.App.3d 1636, 1651.) The trial court, however, effectively sustained it; at least, that is the implication of its reference to section 770, which concerns conditions for the admission of a witness's prior inconsistent statements. Prior inconsistent statements fall within an exception to the hearsay rule. (Evid. Code, § 1235.) Apparently, then, the court excluded the transcripts as hearsay.

**2. Predicate Objection**

City contends that Seibert forfeited his hearsay objection by failing to assert it during the Commission hearings. Seibert counters in effect that an objection would have been futile in light of SJMC section 3.04.1410, subdivision (A)(4) (§ 3.04.1410(A)(4)), which states that in proceedings before the Commission, "[h]earsay evidence may be used for the purpose of supplementing or explaining other evidence but shall not be sufficient in itself to support a finding unless it would be admissible over objection in a civil action."

42

The cited provision appears to have been drawn verbatim from a now-superseded version of a statute governing adjudicatory proceedings before state administrative agencies. (See former Gov. Code, § 11513, subd. (c), added by Stats.1945, ch. 867, § 1, p. 1632.) Cases applying that version of the statute were sharply divided over the necessity of a objection during the administrative proceeding. Some courts held that failure to object before the administrative tribunal forfeited the objection and allowed the tribunal to consider the evidence for all purposes. (E.g., *Kirby v. Alcoholic Bev. etc. Appeals Bd.* (1970) 8 Cal.App.3d 1009, 1018-1020; *Borror v. Department of Investment* (1971) 15 Cal.App.3d 531, 546-547; see *Bedoe v. County of San Diego* (2013) 215 Cal.App.4th 56, 60.) Others held that the statute rendered an objection futile, thereby permitting the opposing party to raise the hearsay issue at any time in the form of a contention that the challenged evidence was insufficient to support a finding. (*Martin v. State Personnel Board* (1972) 26 Cal.App.3d 573, 580-581 [criticizing *Kirby*]; *McNary v. Department of Motor Vehicles* (1996) 45 Cal.App.4th 688, 696 [noting "two competing lines of cases" and following *Martin*]; see *San Dieguito Union High School Dist. v. Commission On Professional Competence* (1985) 174 Cal.App.3d 1176, 1189 ["The lack of an objection does not convert legislatively declared incompetent evidence into substantial evidence to support a finding."].)

We believe the cases requiring a predicate objection before the agency are nearer the mark than those declaring such an objection unnecessary. The effect of the statute— here, the municipal code section—is to make certain hearsay evidence admissible *for a limited purpose*, i.e., supplementing or explaining other evidence. This triggers the longstanding rule codified in Evidence Code section 355, which states, "When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added; see *Riverside Water Co. v. Gage* (1895) 108 Cal. 240, 245;

43

*Hatfield v. Levy Brothers* (1941) 18 Cal.2d 798, 810; *Mercado v. Hoefler* (1961) 190 Cal.App.2d 12, 20.)  In the absence of such a request, the evidence is " 'usable for any purpose.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 888, quoting *Allen v. Enomoto* (1964) 228 Cal.App.2d 798, 801.)  The rule applies in nonjury cases.  (E.g., *Foreman & Clark Corp.*, *supra*.)  We can think of no reason to suppose that it does not apply in adjudicatory proceedings before administrative agencies.  Thus, while an objection to such evidence may not be effective to *exclude* the evidence, it is hardly futile.  If understood as a request to limit the scope of the evidence, the objection prevents consideration of the evidence for broader purposes.  And if the objection is not so understood, it is only because the objecting party has chosen the wrong remedy by framing it as an objection rather than a request to "restrict the evidence to its proper scope."  (Evid. Code, § 355.)  Here, if Seibert contended that the transcripts were admissible only to "supplement[] or explain[] other evidence" (§ 3.04.1410(A)(4)), he should have asked the Commission to limit them to that purpose.

However, in 1995, the statute on which section 3.04.1410(A)(4) is based was amended to explicitly require a "timely objection."  (Gov. Code, § 11513, subd. (d) as amended by Stats. 1995, ch. 938, 540, as added by Stats. 1992, ch. 1302, § 9; see former Gov. Code, § 11513, subd. (c).)  This effectively ratifies the cases holding that failure to object permits an agency to consider hearsay for all purposes.  It does not favor City's position, however, for the accompanying Law Revision Commission Comment declares that an objection is "timely" if "made before submission of the case or on reconsideration."  (Cal. Law Revision Com. com., 32D West's Ann. Gov. Code (2005 ed.) foll. § 11513, p. 460.)  By that standard, the objection here was timely, since it was made by motion to dismiss prior to the last hearing, and was reiterated in Seibert's motion for reconsideration.  The same result follows from treating Seibert's objection as a request under Evidence Code section 355 to consider the evidence only for the purposes

44

authorized by section 3.04.1410(A)(4).  While we have found no decision addressing the precise question, it seems logical to suppose that, at least in general, a request under Evidence Code section 355 may be made at any time before the matter is submitted to the trier of fact.[15]  Certainly it is common in jury trials for admonitions concerning limited admissibility to be requested and given when the evidence is introduced, at the close of trial, or both.

We conclude that Seibert did not forfeit the hearsay objection procedurally. We therefore turn to the merits of the objection.

### 3.  Hearsay

Any analysis of a hearsay objection must begin by asking whether the challenged evidence qualifies as hearsay at all.  Hearsay of course is "evidence of . . . statement[s] that [were] made other than by a witness while testifying at the hearing," and that are "offered to prove the truth of the matter stated."  (Evid. Code, § 1200, subd. (a).)  There can be no doubt that the interview transcripts at issue here constitute hearsay.  They were evidence of statements made by Firefighter Fazio outside the Commission hearings, and they were offered to prove the truth of their contents, i.e., as substantive evidence of the matters they quoted Fazio as saying.

Having determined that evidence constitutes hearsay, the question becomes whether it falls within an exception to the rule mandating exclusion.  We have

---

[15]  Late requests to limit evidence should not be encouraged, however, because they can create difficulties for both parties and for the trier of fact.  The party seeking to limit the evidence is usually best served by having the factfinder immediately apprised that the evidence has a limited purpose, lest the factfinder's perception of the case be tainted by impermissible implications flowing from the challenged evidence.  The proponent of the evidence, of course, benefits from an opportunity to cure the deficiencies or submit additional evidence.  An early request also minimizes potential for confusing the factfinder by belatedly asking it to set aside initial impressions of the facts.  And it relieves the trial court of potential issues arising from, e.g., a proponent's late request to reopen evidence to address late-identified weaknesses in its case.

determined that it falls within one of two exceptions—prior inconsistent statements (Evid. Code, § 1235) or past recollection recorded (*id*., § 1237)—depending on whether Fazio's failure of recollection before the Commission is found to be genuine. Either way, however, the transcripts were admissible over a hearsay objection.

### 4. Prior Inconsistent Statement

A hearsay statement is admissible as a prior inconsistent statement if it "is inconsistent with [the witness's] testimony at the hearing and is offered in compliance with Section 770." (Evid. Code, § 1235.) The cross-referenced section requires the exclusion of prior inconsistent statements "unless: (a) The witness was so examined while testifying as to give him an opportunity to explain or deny the statement; or (b) the witness has not been excused from giving further testimony in the action." (Evid. Code, § 770.) There are thus two main requirements to bring the exception into play: (1) the prior statement must be inconsistent with the witness's testimony, and (2) the witness must either be given an opportunity to explain or deny the statement, or must remain available to do so.

There is no doubt that the second requirement was satisfied here in two different ways. First, during her testimony Fazio was "give[n] . . . an opportunity to explain or deny" each statement in the transcript. (§ 770, subd. (a).) Moreover, she had "not been excused from giving further testimony in the action" when the statements were received. (*Id*., subd. (b).) Accordingly, the applicability of the exception turns on the question whether the transcripts were inconsistent with her testimony before the Commission. We find ample basis in the record for a finding to that effect.

A witness's professed failure of recollection can "constitute an implied denial" of the events described in earlier statements, rendering them inconsistent with the witness's testimony. (*People v. Green* (1971) 3 Cal.3d 981, 989.) " '[W]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As

46

long as there is a reasonable basis in the record for concluding that the witness's "I don't remember" statements are evasive and untruthful, admission of his or her prior statements is proper. [Citation.]' [Citation.] The requisite finding is implied from the trial court's ruling. (Evid.Code, § 402, subd. (c).)" (*People v. Ledesma* (2006) 39 Cal.4th 641, 711-712.)

Here Fazio made no secret of her opposition to the disciplinary proceeding. As she acknowledged having told the investigator—while denying any memory of doing so—she "never really wanted to report any of this. I never wanted an investigation. I just wanted [Seibert] removed." Her opposition may be attributable to her own sense of justice, her fear of ostracism by her coworkers, or both. We can readily picture the victim-blaming mentality that doubtless prevailed among some firefighters once Seibert's conduct toward her became a ground of harsh disciplinary action against him. Whatever the cause, the Commission could quite reasonably infer that her professed inability to recall the misconduct she had earlier reported was driven by a desire to undo the consequences of that report and did not reflect an actual failure of memory. A finding to that effect is implied from the Commission's ruling as well as from its members' own questioning of the witness.

However, the trial court impliedly found to the contrary. As we recently noted, a trial court exercising its independent judgment is empowered and obliged to " 'weigh the evidence at the administrative hearing and . . . make its own determination of the credibility of witnesses.' " (*Rodriguez v. City of Santa Cruz* (2014) 227 Cal.App.4th 1443, 1451, quoting *Guymon v. Board of Accountancy* (1976) 55 Cal.App.3d 1010, 1016.) Our review of the trial court's findings is governed, in turn, by the substantial evidence test, which requires us to " ' "resolve all conflicts and indulge all reasonable inferences in favor of the party who prevailed in the trial court." ' " (*Id.* at p. 1452, quoting *Worthington v. Davi* (2012) 208 Cal.App.4th 263, 277.) Of course, this standard

does not permit us to abdicate all responsibility to ascertain the soundness of the lower court's findings. We must consider whether those findings are supported by "evidence that a rational trier of fact could find to be reasonable, credible, and of solid value." (*Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 99.) Moreover, evidence is not substantial for these purposes merely because, viewed in isolation, it supports a challenged finding. Rather, the trial court must "consider 'the whole record' in reviewing the evidentiary basis for the administrative decision.' " (*Bixby v. Pierno, supra,* 4 Cal.3d 130, 149, fn. 22; see *California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 585-586.)

These principles present something of a conundrum here. On the one hand, Fazio's explicit testimony that she had no recollection of relevant events would seem to provide ample evidence in support of the trial court's implied finding. On the other, after a review of the entire administrative record, we find ourselves viewing that finding with a degree of incredulousness. However, assuming her professed failure of recollection was genuine, the transcripts were still admissible as past recollection recorded.

### 5. Past Recollection Recorded

Assuming Fazio's failure of recollection was genuine, the evidence in this record is nonetheless sufficient to permit introduction of her transcribed statements as past recollection recorded. That exception permits the introduction of a hearsay statement "if the statement would have been admissible if made by [the witness] while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) [w]as made at a time when the fact recorded in the writing actually occurred or was fresh in the witness'[s] memory; [¶] (2) [w]as made . . . (ii) by some other person for the purpose of recording the witness'[s] statement at the time it was made; [¶] (3) [i]s offered after the witness testifies that the statement he made was a true

statement of such fact; and [¶] (4) [i]s offered after the writing is authenticated as an accurate record of the statement." (Evid. Code, § 1237, subd. (a).)

Here, as we have noted, any objection to the transcripts based on lack of authentication was forfeited for want of timely assertion. The only other element of the exception as to which there can be any doubt is the third, i.e., that the statement be "offered after the witness testifies that the statement [s]he made was a true statement of such fact." Here Fazio repeatedly testified that whatever she told the investigator was true. After questioning by the parties had concluded, she further affirmed the accuracy of the transcript in the following exchange with a member of the Commission: "Q Ms. Fazio, is—in your opinion, having reviewed the report by the investigator, is that—*did the investigator accurately report your interview?* [¶] A *I believe so.* I have no reason to say why they wouldn't report it the way it was. [¶] Q But what they wrote you feel was accurate, what the conversation between the two of you? [¶] A Yeah. I don't remember the conversation, so this is all I have to go on. Yes. *I believe it's accurate.*" (Italics added.) This is a sufficient vouching for the accuracy of the prior statement. (See *People v. Cowan* (2010) 50 Cal.4th 401, 466-467.)

We conclude that the trial court erred by refusing to consider Fazio's prior statements in support of the Commission's findings on counts three through five of the notice of discipline. This error is clearly prejudicial with respect to those findings and requires reversal.

## VI. *Interference with Discretion Regarding Penalty*

City argues that the trial court also erred by finding that Seibert's dismissal constituted excessive discipline and an abuse of discretion. Having sustained only one of the charges against Seibert, and having found that even that conduct did not offend any distinct rule or policy, the court wrote, "Mr. Siebert's and Miss C[.]'s emails were tawdry, unfortunate and potentially embarrassing. Because of the risk of embarrassment

49

to the City, they support some progressive disciplinary action on the part of the fire department. His conduct, however, does not rise to the level of termination for a person with an otherwise blameless record." City cites several cases holding that "discredit" to a public employer, or even "potential discredit," may be sufficient ground for termination. (E.g., *Lake v. Civil Service Commission of the Fire Department of the City of Bakersfield* (1975) 47 Cal.App.3d 224, 228.) City does not deny, however, that it is within the power of the trial court in a case of this kind to determine whether discipline imposed is so excessive as to constitute a manifest abuse of discretion. (See *Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 45.) City's chief concern seems to be that the language use by the trial court could be understood to constrain the discretion of the administrative tribunal on reconsideration, in violation of holdings that the court "may vacate but not modify the agency's determination of penalty if it finds a manifest abuse of discretion." (*Ibid*.) City's concerns about this language are not assuaged by the court's recital, which City finds "contradictory," that the judgment "shall not limit or control in any way the discretion legally vested in the respondents to impose a proper level of discipline consistent with their policies."

We need not analyze this question in any great depth because our reversal on other grounds will permit the trial court to reevaluate its treatment of all of the charges, and will require it to do so with respect to the Fazio charges. Whatever the court's conclusions, we caution it not to adopt language that could be reasonably understood to constrain the Commission's discretion upon reconsideration of penalty.

## VII. Remand to ALJ or Arbitrator

### A. Background

Seibert contends that any remand from the trial court for reconsideration of the Commission's decision must be governed by the Firefighters' Procedural Bill of Rights (Gov. Code, §§ 3250-3262) (FPBOR), which requires that a disciplinary appeal such as

50

his be heard by an administrative law judge (ALJ) or, if the employment is subject to a labor agreement so providing, a neutral arbitrator. City contends that the FPBOR is inapplicable to the charges against Seibert, and that insofar as he may have had a right to arbitration under the governing collective bargaining agreement, he failed to perfect or preserve it.

As relevant here, the FPBOR provides that an "employing department" shall not take "[p]unitive action" against a non-probationary firefighter "without providing the firefighter with an opportunity for administrative appeal."[16] (Gov. Code, § 3254, subd. (b).) Seibert of course received such an appeal pursuant to City's own laws; but it was heard and determined by the Commission, whereas the FPBOR provides that such an appeal is to be heard "in accordance with Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2," which is the chapter of the Administrative Procedures Act governing adjudicatory hearings. (*Id*., § 3254.5, subd. (a).) Among these rules and procedures is a requirement that any adjudicatory hearing be conducted by an administrative law judge. (Gov. Code, § 11502, subd. (a).) The FPBOR provides an exception when the employment relationship is governed by a memorandum of understanding (MOU) providing for binding arbitration; in that case, "the arbitrator or arbitration panel shall serve as the hearing officer . . . and, notwithstanding any other provision, that hearing officer's decision shall be binding." (*Id*., § 3254.5, subd. (b).)[17]

---

[16] "Punitive action" is defined as "any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment." (Gov. Code, § 3251, subd. (c).)

[17] The cited subdivision further provides that "a memorandum of understanding negotiated with an employing agency shall not control the process for administrative appeals instituted with *licensing or certifying agencies*. Any administrative appeal instituted with *licensing or certifying agencies* shall adhere to the requirements prescribed in subdivision (a)." (Gov. Code, § 3254.5, subd. (b), italics added.) Seibert interprets this to mean that "the MOU shall not control the process for administrative appeals." That is true only as to "licensing or certifying agencies." This case does not

51

When the events at issue here occurred, the City took the position that it was exempt from the requirements of the FPBOR by virtue of its status as a charter city. (See *International Assn. of Firefighters Local 230 v. City of San Jose* (2011) 195 Cal.App.4th 1179 (*Local 230*).) We ultimately held otherwise (*ibid.*), but by then Seibert's appeal before the Commission had been concluded. We do not understand him to contend that the Commission erred in this regard; after all, he himself initiated the appeal, and we see nothing in the record suggesting that he did so under any sort of protest or reservation of rights.[18] Instead the question is, as he states in his brief, "to which body the case should be remanded" by the trial court after jurisdiction is returned to that court by us.

This question assumes that after disposition of this appeal, the trial court will again grant Seibert's petition and issue a writ setting aside the Commission's decision. Our general reversal will set the matter at large in that court. (9 Witkin, *supra*, Appeal, §§ 869-870, pp. 928-930.) If the court again elects to grant Seibert's petition, the nature of any further proceedings at the administrative level will depend on the precise nature of the relief granted. If the court again determines that the evidence is insufficient to support the Commission's findings, the Commission—or whatever decisionmaker receives the remand—will be able to hear additional evidence in support of the Department's charges, unless doing so would be so unfair as to implicate due process

involve such an agency, but rather an "employing department" (see *id*., §§ 3253, 3254, subd. (b); cf. *id*., § 3254.5, subd. (b) ["employing agency"]). All the cited provision really appears to mean is that a licensing or certifying agency will not be bound by an appeal procedure prescribed in an MOU to which it is not a party.

[18] In his request for modification of the trial court's original statement of decision, Seibert asserted that he had "requested a hearing as provided by the F[P]BOR, but the City claimed the F[P]BOR did not apply to them." We see nothing in the record substantiating this assertion. Seibert did invoke the FPBOR, well after initiating his appeal, in support of a request for the production of documents. In response, City denied the applicability of the FPBOR and noted that the issue was pending before this court.

concerns. (See *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 526, 528, 534, 535.) If reversal is based upon an issue fundamental to the proceeding, it may "leave[] the entire case at large for further proceedings." (*Marsh v. Workmen's Compensation Appeals Board* (1968) 257 Cal.App.2d 574, 580.) Further proceedings may also be necessary if, as seems highly likely to obtain here, the court's decision "leaves open to the agency any further discretionary powers." (*Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 78.)

The question is what entity or body should conduct such further proceedings, if any are required. Given the uncertainties noted above, as well as the rather deficient briefing of the surrounding issues, we would act well within our discretion to defer this issue pending further proceedings in the trial court. However we think it best to address the issue now in the interest of advancing the case most efficiently toward a final resolution.

### B. Scope of Statute

We first consider City's argument that the charges here fall outside the FPBOR by virtue of Government Code section 3262 (§ 3262), which provides, "The rights and protections described in this chapter shall only apply to a firefighter during events and circumstances involving the performance of his or her official duties." This language is, to put it mildly, awkward. It was added to the bill some four months after its introduction. (Assem. Bill No. 220 (2007-2008 Reg. Sess.) § 1, as amended Jun. 4, 2007; cf. Assem. Bill No. 220 (2007-2008 Reg. Sess.) § 1, as introduced Jan. 29, 2007.) We find no explanation for the amendment in the legislative materials we have reviewed. However, two legislative reports appear to refer to this provision when they state that the bill "[s]pecifies that the rights and protections afforded by [the bill] only apply to firefighters when they are *performing job-related duties*." (Assem. Chief Clerk's Office, Floor Analysis Unit, 3d Reading Analysis of Assem. Bill No. 220 (2007-2008 Reg. Sess.)

53

as amended Jun. 4, 2007[19], p. 2, italics added; Assem. Chief Clerk's Office, Floor Analysis Unit, 3d Reading Analysis of Assem. Bill No. 220 (2007-2008 Reg. Sess.) as amended Jul. 2, 2007, p. 2.)

City contends that the charges against Seibert fail this test, but its argument on this point is sketchy at best. First, with respect to the charges involving Firefighter Fazio, City asserts that Seibert's conduct fell outside the statute's reach because it was "contrary to [his] responsibilities." It then invokes the holding in *Farmers Insurance Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1017, that a deputy sheriff's sexual harassment of fellow deputies "was not within the scope of employment" so as to require the county to indemnify the deputy's insurer for costs of defending and settling a sexual harassment lawsuit. We are far from certain that the legal test applied in that case is the same as, or usefully comparable to, the test for determining whether disciplinary measures against a firefighter are subject to the FPBOR. (See *id.* at pp. 1003-1008 [canvassing principles governing scope of employment questions in respondeat superior context].) But we need not closely analyze the question because City's argument gets ahead of itself by assuming the *truth* of the charges. In the cited case, by the time the issue was determined the offending employee had *admitted* engaging in flagrant misconduct toward his coworkers. (*Id.* at p. 998.) We cannot assume that Seibert did any such thing. There has not yet been a final determination of that issue. The question at hand is what procedure will apply to any further proceedings to secure such a determination. For purposes of section 3262, the question cannot be whether the conduct *alleged* by the employing agency falls outside a firefighter's duties. The question must

---

**19** The report refers to the amendment as having been made on June 1. The amendment itself recites that it was made on June 4. The latter date is also reflected in the bill's official history. (See Bill History, <http://leginfo.legislature.ca.gov/faces/billHistoryClient.xhtml?bill_id=200720080AB220> (as of May 26, 2016).)

54

be more along of the lines of whether the firefighter was engaged in the performance of his or her duties when the misconduct is alleged to have occurred.

There is little doubt that the charged misconduct involving Fazio arose while Seibert was performing his duties as a firefighter. The charges all arose from their interactions at the training center, where both had been assigned. We are directed to no evidence that any of the relevant conduct took place outside working hours. Again, the only way to conclude otherwise is to assume the truth of the charges and then accept City's legal contention that this placed them outside the scope of the statute. We will not indulge such reasoning. We therefore conclude that the Fazio charges, at least, fall within the purview of the FPBOR.

It is at least possible that insofar as the charges rested on Seibert's sending text or voice messages to Fazio, some or all of the charged conduct might have occurred off the Department's premises. Similarly, it may be debatable whether Seibert's e-mailing activities while otherwise idle—though on duty—fall within the FPBOR's reach. We need not finally decide these issues, for it is clear that at least the bulk of the Fazio charges fall within the FPBOR, which mandates that they, at least, be decided by an ALJ. It is not suggested that the charges, having been joined together by the City, must now be severed, with some to be heard by the Commission and others by an ALJ. Having elected to join the charges, City cannot be heard to suggest—and indeed it does not suggest—that some sort of bifurcated proceeding is called for. Accordingly, since some of the charges fall squarely within the SPBOR, all of them must be resolved in accordance with that act.

### C. ALJ or Arbitrator

Seibert asserts that any remand must be heard by either an ALJ or a labor arbitrator. He declines to commit himself to one or the other, apparently because some legal uncertainty attends the question of which is called for under the FPBOR. City

asserts that he waived any right to binding arbitration by failing to secure his union's agreement to it.

Neither the record nor the briefing disclose all of the potentially relevant procedural details, but as best we can determine Seibert has no present right to binding arbitration, as distinct from a determination by an ALJ. He appealed his dismissal to the Commission on December 3, 2009. On that same date, his attorney wrote to the City Manager requesting arbitration pursuant to a provision of City's policy manual which counsel quoted as stating that employees represented by the firefighter's union " 'may . . . appeal to arbitration.' " Counsel added, "The way we read and interpret the language of this Policy Manual Section is that Mr. Seibert may himself request arbitration on his own behalf." He did not, apparently, invoke the provisions of the FPBOR, and it would apparently have been futile to do so since the City then took the position that it was exempt from that act. (See *Local 230*, *supra*, 195 Cal.App.4th 1179.) City responded to his demand for arbitration by asserting that the governing MOU, which it appeared to quote, made it a precondition of binding arbitration that " 'the Union must agree (i.e., must be the party taking the matter to arbitration).' " City asked Seibert to "provide written documentation that the Union is in agreement in moving this disciplinary matter to binding arbitration. In the event written verification is not provided by December 22, 2009, this disciplinary matter will be heard before the Civil Service Commission." Apparently such documentation was not forthcoming, although in August 2010, in connection with a demand that the Commission hear the appeal forthwith, Seibert's attorneys wrote that they "renew[ed] our position that Mr. Seibert is entitled to binding arbitration in this matter, and renew[ed] that request as an alternative, if a hearing cannot be heard within 45 days as required by the above referenced Civil Service Rule."

56

Seibert may be understood to contend that whenever a firefighter's employment is governed by a MOU containing a provision for binding arbitration, the firefighter is entitled to binding arbitration of any disciplinary charge subject to the FPBOR, regardless whether the agreement itself calls for arbitration under the particular circumstances. Such a reading is untenable. The statute provides that a firefighter may invoke an arbitration provision "if the employing department is subject to a memorandum of understanding that provides for binding arbitration of administrative appeals." (Gov. Code, § 3254.5, subd. (b).) The apparent intention of this provision is merely to preserve, not to expand, a firefighter's right to binding arbitration pursuant to a collective bargaining agreement. It operates as an exception to the rule declared in the preceding subdivision, which is that all administrative appeals must be heard by an ALJ. (*Id.*, subd. (a).) It follows that if concurrence by the union is a contractual precondition, and such concurrence has not been given—points Seibert does not seem to dispute—the exception would not be triggered, and the rule (adjudication by an ALJ) would govern. If there is any reason to conclude otherwise, Seibert has not presented it to us.

We conclude that in the absence of further evidence or new developments, any further administrative proceedings must take place before an ALJ as mandated by the FPBOR.

## DISPOSITION

The judgment is reversed for further proceedings consistent with the views expressed in this opinion. This disposition renders moot Seibert's claim for attorney fees. City will recover its costs on appeal.

57

_____

RUSHING, P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.

*Seibert v. City of San Jose et al.*
**H040268**

58

Trial Court:                                Santa Clara County Superior Court
                                            Superior Court No.:  1-11-CV204096


Trial Judge:                                The Honorable Franklin E. Bondonno

                                            The HonorableWilliam J. Monahan



Attorneys for Plaintiff and Appellant       Hal F. Seibert
Grant Seibert:







Attorneys for Defendants and Appellants     Richard Doyle,
City of San Jose et al.:                    City Attorney

                                            Nora Frimann,
                                            Assistant City Attorney

                                            Kathryn Zoglin,
                                            Senior Deputy City Attorney





*Seibert v. City of San Jose et al.*
**H040268**