Filed 10/3/22 Luther v. County of San Luis Obispo CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| LARS LUTHER,<br><br>    Petitioner and Appellant,<br><br>v.<br><br>COUNTY OF SAN LUIS OBISPO, et al.,<br><br>    Respondents. | 2d Crim. No. B313857<br>(Super. Ct. No. 19CV-0713)<br>(San Luis Obispo County) |

Appellant Lars Luther, a Correctional Deputy employed by the San Luis Obispo County Sheriff's Department (the Department), challenges the trial court's order denying his petition for writ of administrative mandate challenging the decision of the County of San Luis Obispo Civil Service Commission (the Commission)[1] sustaining his demotion for using

---

[1] The County of San Luis Obispo (the County) is also named as a respondent in these proceedings. The County and the Commission are collectively referred to as respondents.

excessive force against an inmate at the county jail. (Code Civ. Proc., § 1094.5, subd. (c).)[2] Appellant contends the findings that he used excessive force are not supported by substantial evidence. He alternatively claims that the decision to demote him rather than impose a lesser form of progressive discipline was an abuse of discretion. We affirm.

## FACTS AND PROCEDURAL HISTORY
### *The Excessive Force Incident*

Appellant began working as a Correctional Deputy for the Department in 1990. In 1996, he was promoted to Senior Correctional Deputy.

On October 4, 2018, appellant and Correctional Deputy Rene Cadena were stationed at the county jail across from the Medical Isolation Unit (MIU), where inmate Shawn Sleeth was housed. As depicted in surveillance video, appellant approached one of the cells to move another inmate. Sleeth attempted several times to hand appellant mail and appellant told him to "hang on." Sleeth shoved the mail at appellant and he took it, threw it on the ground, and walked away. When Cadena kicked the mail to get it out of the way, Sleeth thought he was kicking it toward the trash can. Sleeth began yelling obscenities, called appellant a "piece of shit," and demanded a grievance form. He also kicked his cell door and hit the window with his hand.

Appellant went to the window of Sleeth's cell, removed the curtain, and threw it on the floor. Although Sleeth was glaring at appellant with his hands balled into fists at his sides, appellant unlocked the door to Sleeth's cell and ordered him to exit the cell. Cadena observed that Sleeth appeared "very aggressive" while he

_____

[2] All statutory references are to section 1094.5 of the Code of Civil Procedure.

was still in the cell and had positioned himself in a stance that appeared combative. As depicted in the surveillance video, however, Sleeth exited the cell with his hands behind his back.

After Sleeth exited the cell, appellant grabbed him by the back of the neck with one hand, placed his other hand on Sleeth's throat, and repeatedly shoved him into the wall. Sleeth initially kept his hands behind his back, then moved them to protect his face from hitting the wall. Appellant grabbed Sleeth's neck and forced him to the ground. Cadena assisted appellant in handcuffing Sleeth by placing his knee on Sleeth's back.

Appellant then walked Sleeth down the hall to the Main Jail Gate while Cadena and Correctional Deputy David Rocha followed behind. As they were walking down the hall, appellant appeared angry and was yelling at Sleeth. As he walked past Correctional Sergeant Joshua Pentor, he yelled, "I've got this fucking piece of shit . . . . Get out of my way." Sleeth repeatedly said, "I'm sorry." While waiting for the gate to open, appellant utilized a pain compliance technique by pressing his thumb on Sleeth's neck below his ear. After the gate opened, appellant pushed Sleeth through the gate and handed him off to other deputies.

### *The Investigation, Complaint, And Notice*

Appellant submitted a report regarding the incident. Pentor and Correctional Sergeant Jeremy Rau reviewed the video surveillance of the incident and completed a report. Commander Jim Voge, who has since been promoted to Undersheriff, conducted the investigation into the incident. On October 10, 2018, the Department filed a formal written complaint against appellant for using excessive force against Sleeth.

3

On December 21, 2018, the Department filed notice of its intent to issue an order of demotion (the notice) based on appellant's violation of County and Department rules, conduct unbecoming a public service employee, and violations of the Department's policies regarding employee conduct, performance, and use of force.  The notice alleged that appellant had violated the Department's use of force policy by (1) grabbing Sleeth's neck without any tactical purpose for doing so; (2) slamming Sleeth against the wall with excessive and unnecessary force; (3) taking Sleeth to the ground to handcuff him; and (4) unnecessarily using a pressure point pain compliance technique when he escorted Sleeth to the Main Jail Gate.

The notice stated that "[i]nmate Sleeth admittedly attempted to make you upset with his language and antics.  At the same time, Sleeth believed that he would not be assaulted, because he knew how to physically remain submissive and follow your orders.  The video evidence along with witness statements portrays a compliant inmate; your characterization of a resistive inmate is not supported with any evidence.  [¶]  In this case, you were upset with Sleeth for his verbal barrage against you, and you were unable to effectively control your emotions resulting in engaging in excessive force and improper tactics against a submissive inmate."

The notice also alleged "you have had three sustained formal disciplinary matters about your conduct or performance during the last five years.  The first discipline involved gender-based discourteous remarks directed to fellow employees.  You were suspended for 36 hours with 24 hours held in abeyance.  The second discipline involved your profanity laced tirade in the workplace directed at a newly promoted female lieutenant.  You

4

made these remarks in front of coworkers. You received a letter of reprimand. The third discipline also involved improper remarks. You made profane, disrespectful remarks in the Sheriff's Office in front of the Sheriff's Assistant. Your words and tone were characterized as angry, loud and unprofessional. You received a letter of reprimand." The notice went on to state that "[a]fter taking into consideration the seriousness and the evidence of the sustained allegations against you, coupled with your inability or unwillingness to learn from your past disciplinary and training, demotion is the only appropriate penalty."

### *Administrative Hearing; Incidents Of Prior Discipline*

After appellant was demoted, he filed an appeal with the Commission. At the administrative hearing, appellant asserted that when he told Sleeth to exit his cell Sleeth walked near him with his shoulder down, which appellant believed was "a precursor to a strike." Appellant also offered that he put his hand at the back of Sleeth's neck to direct him to the wall after he unsuccessfully reached for Sleeth's arm, then brought his other hand to the front of Sleeth's neck to control him. He decided to take Sleeth to the ground because he was continuously resisting as he was against the wall. Appellant used a pressure point compliance technique, i.e., pressing his thumb under Sleeth's ear, because appellant was "pulling down on [appellant's] arm and . . . struggling and . . . was placing his weight down on [appellant's] arm and he was yelling."

As stated in the notice, the instant matter was appellant's fourth instance of formal discipline in the preceding five years. In 2015 appellant faced nine separate allegations of inappropriate exchanges with female colleagues, four of which

5

were ultimately sustained and resulted in an order of suspension. The first incident occurred when appellant wanted Correctional Technician Sharlotta Brown to print a document for him. After Brown failed to provide the response appellant wanted, he began tapping on the counter and said, "Hey woman, woman. Hey woman why don't you get your woman's work done?" Brown told appellant to stop making such comments but he continued doing so while snapping his fingers. When Brown became agitated, appellant laughed and walked away. During an investigation into the incident, Correctional Deputy Adam Jackson reported that he had heard appellant refer to women as "skirts." When appellant was interviewed, he denied referring to woman as skirts and said the term was used when deputies were assigned to the female jail. When he testified at the administrative hearing, he claimed he was merely discussing how "back in the 50's, 60's, males used to refer to females in the work space as dame or skirt." He also denied making the remarks attributed to him by Brown and Jackson.

As to the second sustained allegation, Correctional Deputy Kara Dickel asked appellant to take out a trash can filled with expectorated chewing tobacco. Appellant told Dickel to "put on your big girl skirt or big girl panties . . . and suck it up." Dickel asked, "[E]xcuse me?" Appellant replied, "If you are going to work with [the] big boys, put on your big girl panties." Dickel was offended by the remarks and told appellant the trash can was "disgusting" and that it had nothing to do with gender. Appellant never emptied the trash can and later chastised Dickel for having a "chip on her shoulder."

The third sustained allegation involved an incident between appellant and Correctional Officer Kelsey Williams that

6

was witnessed by Jackson and Correctional Deputy Mayes. Williams showed the group of photograph of herself and her boyfriend. Appellant responded by telling Williams he would send her a photograph of his penis. Williams was offended and both Jackson and Mayes were shocked by the comment.

When interviewed shortly after the incident, appellant claimed he did not recall making the remark but admitted he may have told Williams "maybe she needed a photograph of him" since she was showing him a photograph of herself. When appellant testified before the Commission, he claimed the group was discussing "dick pics" and that he asked what that meant. According to appellant, Jackson then asked him if he was "going to send her one" and he replied "[n]o, I'm not going to send one to anybody." Appellant claimed that all four of the witnesses were lying about what had happened. Appellant also told the Commission that Undersheriff Voge's summary of appellant's statement was also a lie.

The fourth sustained allegation involved Correctional Technician Helena "Kitti" VanDahlen and Mental Health Therapist Wesley De Moss. Appellant approached VanDahlen and De Moss and said "the grass was this high" while making a Nazi-type salute with his arm. VanDahlen said she did not know what appellant was talking about and he repeated the remark and salute. VanDahlen indicated that De Moss still did not understand what appellant was talking about. Appellant then told De Moss, "It's a white supremacist thing that you would not understand but Kitti would." VanDahlen told appellant she was offended by his statement and gesture because she was Jewish. Appellant stuttered and tried to laugh the matter off.

7

When initially questioned about the incident, appellant admitted making the remark and gesture but claimed he was merely joking and had not meant to offend anyone. When he testified before the Commission, however, he claimed he was merely yelling at an inmate who was a white supremacist and said "[h]ey partner, yeah, the grass is about that high, huh? You're an idiot." He then apologized to VanDahlen and asked if he had offended her and she replied "no." Once again, appellant claimed he was telling the truth while everyone else was lying.

Appellant had also received two prior letters of reprimand. In 2016, he was reprimanded for screaming at then-Correctional Sergeant Denise Armstrong about her promotion to Lieutenant. Appellant called Armstrong "stupid," a "moron," and a "fucking idiot." He then said Captain George Clarkson needed to "grow a set of balls" and that the Sheriff and Undersheriff had "their heads so far up their ass[es]." The entire incident was observed by Rau and Correctional Deputy John Huskey. When appellant was initially interviewed about the incident, he admitted saying Clarkson needed to "drop a set" and that he may have called Armstrong a "frickin idiot" but did not remember calling Armstrong a "stupid moron." In testifying before the Commission, appellant denied calling Armstrong "fucking idiot," "stupid," or a "moron" and claimed that Rau and Huskey were lying.

In 2018, appellant received another letter of reprimand (which was reduced from a suspension held in abeyance) following an outburst and the Sheriff's office. Appellant went to the office for a union meeting with Sheriff Parkinson and union representatives. Appellant did not know that the office had sent a message earlier that day stating that the meeting had been

8

cancelled.  When Records Manager Vicke O'Keeffe offered appellant alternative times to meet, he made a dismissive gesture opening and closing his hand in a talking motion. O'Keeffe told appellant he did not have to be rude and he replied "I'm not going to be kicked to the fucking curb."  The incident was witnessed by Administrative Services Manager Jennie Brunick, who characterized appellant's behavior as rude and hostile. Appellant initially stated that he did believe he had sworn at anyone and apologized to O'Keeffe.  In testifying before the Commission, appellant claimed that he merely told O'Keeffe "[y]ou've got to be kidding me" and claimed that O'Keeffe and Brunick were lying.

### *Administrative Findings And Decision;*
### *Petition For Writ Of Administrative Mandate*

On August 28, 2019, the Commission issued its findings and decision upholding appellant's demotion.  The Commission found that appellant had used excessive force in violation of the Sheriff's policies as alleged in the notice and that his "story regarding his interaction with Inmate Sleeth is incredible and not worthy of belief.  The far better explanation for Appellant's conduct is that he was angry during the whole transaction, and took his anger out on Sleeth.  Appellant was extremely angry with Sleeth from the moment he ripped the curtain off the window until the final shove in the IRC, and his anger guided his actions during this entire process.  While his excuses and explanations are neither credible nor reasonable as the basis for what he was going, his anger offers the most probative explanation for his actions.  All of his conduct is consistent with that of an angry correctional deputy, right up to the final shove, which confirms that [appellant] never cooled down during this

9

interaction. Appellant's unsuccessful attempts to convince the Commission he was not angry further proved that he was."

The Commission also rejected the opinions of Reserve Sergeant Greg Dossey and Sean McCann, who testified as experts on excessive force. The Commission rejected Dossey's opinions because, among other things, they "were based solely upon his review of the video alone. He was unable to testify about the facts and circumstances of the underlying investigations, including the statements of Appellant and others. He lacked context or foundation about what happened." McCann's opinions were rejected because the "relied inherently upon Appellant's version of the events which is not credible."

The Commission also upheld appellant's demotion as a proper penalty for his misconduct. The Commission found that appellant's actions "caused significant harm to the County of San Luis Obispo and the Sheriff's Department" in that "this is the fourth disciplinary action in five years where Appellant has failed to control himself and his patterns of anger and outbursts. Further, the harm is exacerbated by his position as a[ Senior Correctional Deputy,] who is a leader and must train and mentor others. Removing him from this lead role is proper until he can demonstrate he can control his temper." The Commission added that "Sheriff Parkinson confirmed that he demoted Appellant 'because he should not be training other people,' that he needs to protect the public trust, and Appellant was 'emotionally out of control.'"

The Commission further found that appellant's demotion was a proper penalty because misconduct was likely to recur, as evidenced by his numerous prior disciplinary matters and his repeated refusal to take responsibility for his actions. The

Commission stated that "[i]n every case, Appellant's approach to the discipline or issue has been to deflect and divert rather than reflect and examine. The Commission finds that Appellant's conduct is likely to recur based upon his attitude in recent years, and that such recurrence could result in further discipline up to and including termination."

Appellant subsequently petitioned for a writ of administrative mandate under section 1094.5. On February 10, 2021, the trial court issued its decision and order denying the petition. After viewing all of the surveillance video and reviewing all of the testimony and other evidence presented at the administrative hearing, the trial court issued a detailed ruling agreeing with the Commission's finding that appellant had used excessive force against inmate Sleeth in violation of policy by grabbing him by the neck, "slamming or shoving [him] into the wall opposite the cell three times," taking him to the ground to handcuff him, and unnecessarily using a pain compliance pressure point technique. The court also found that appellant's testimony regarding the incident involving Sleeth and the prior incidents for which he was disciplined was not credible.

The court also agreed with the Commission that the determination whether appellant had used excessive force was not governed by the factors set forth in *Graham v. Connor* (1989) 490 U.S. 386 [104 L.Ed.2d 443], and that in any event the application of those factors would still support the finding that appellant used excessive force. The court also found that appellant's demotion was a proper penalty. The court reasoned that "this is the fourth time in five years that [appellant] has been the subject of formal disciplinary proceedings. Rather than acknowledge his problematic behavior, [appellant] has claimed

11

that everyone else is lying about several incidents. This concerned the Commission and it is equally concerning to the Court. [Citation.] The Commission also found that [appellant's] conduct is unbecoming of an individual in public service. As Sheriff Parkinson testified, 'if we cannot control ourselves, our own emotions, we certainly cannot control others.'"

## DISCUSSION

Appellant contends the trial court's findings that he used excessive force against inmate Sleeth are not supported by substantial evidence, and that the decision to demote him rather than impose a lesser form of punishment amounts to an abuse of discretion. We conclude otherwise.

Section 1094.5 governs the procedure for obtaining judicial review of a final administrative determination by writ of mandate. Subdivision (b) of section 1094.5 provides that "[t]he inquiry in such a case shall extend to the questions whether the [Commission] proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [Commission] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." Subdivision (c) of section 1094.5 states: "Where it is claimed that the [Commission's] findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the

12

findings are not supported by substantial evidence in the light of the whole record."

"'Discipline imposed on public employees affects their fundamental vested right in employment.'" (*Ochoa v. County of Kern* (2018) 22 Cal.App.5th 235, 245; accord, *Seibert v. City of San Jose* (2016) 247 Cal.App.4th 1027, 1042 [an individual's "interest in his public employment status implicate[s] a 'fundamental vested right'"].) Accordingly, "the trial court was required to exercise its independent judgment in reviewing the Commission's findings. [Citations.]" (*Seibert*, at p. 1042.) In exercising that judgment, the court must "indulge a 'strong presumption of correctness' with respect to the Commission's findings." (*Ibid.*) On appeal, we "'must sustain the trial court's factual findings that are supported by substantial evidence.'" (*Ochoa*, at p. 246.) The Commission's determination of the appropriate penalty to be issued against a public employee is reviewed for an abuse of discretion. (*Talmo v. Civil Serv. Com.* (1991) 231 Cal.App.3d 210, 226-227.)

Appellant was demoted for using excessive force against an inmate. The subject incident was captured on the jail's video surveillance cameras. Notwithstanding appellant's efforts to parse out each step of his displayed actions, his attempts to undermine the findings as to specific aspects of his behavior, and his efforts to make semantic distinctions regarding the allegations brought against him, it is clear that appellant did exactly what he was charged with doing. "If a picture is worth a thousand words, a moving picture is worth a million." (*People v. Webb* (1999) 74 Cal.App.4th 688, 690.) The cameras do not lie, and appellant's proffered explanations for the conduct depicted on those cameras were properly rejected as not credible.

13

Contrary to appellant's claim, the court also properly found (as the Commission did) that the determination whether appellant had used excessive force against Sleeth was not governed by the factors set forth in *Graham v. Connor*, *supra*, 490 U.S. 386. In that case, the Supreme Court decided "what constitutional standard governs a *free citizen's* claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person." (*Id.* at p. 388, italics added.) The trial court also properly found that "[e]ven if *Graham* were the applicable standard, it would not help [appellant's] claims." The court reasoned: "As the Supreme Court outlined in *Graham*, 'police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.' [Citation.] Here, the court has not seen any evidence that the situation involving Sleeth was tense, uncertain, or 'rapidly evolving.' Indeed, the 'situation' would have not existed had [appellant] left Sleeth in his cell. As noted, Sleeth was yelling at [appellant] to take his mail and shouted obscenities when [appellant] did not immediately do as Sleeth requested. Sleeth struck the window of his cell with an open hand. As can be seen in the subject video, however, Sleeth was in a locked cell and no one has argued that he posed an immediate danger to himself or others. [Appellant] has not adequately explained to the Court how Sleeth's behavior warranted his removal from the cell, or how this behavior presented a 'tense, uncertain, and rapidly evolving circumstance.' The evidence before the Court illustrates that had [appellant] left Sleeth alone to continue yelling in his cell, no use of force would have been necessary at all. Instead, without justification,

14

[appellant] took it upon himself to unlock a cell and remove a yelling, combative individual."

It is also clear that the Commission did not abuse its discretion in upholding appellant's demotion. Sheriff Parkinson testified that appellant was demoted "'because he should not be training other people'" and because the Sheriff "needs to protect the public trust." Given the egregiousness of the current incident, appellant's numerous prior incidents that resulted in disciplinary proceedings, and his untruthfulness and refusal to accept any responsibility for his actions, there are no legitimate grounds for disturbing the Commission's decision.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

NOT TO BE PUBLISHED.


PERREN, J.*


We concur:


GILBERT, P. J.            YEGAN, J.


---

* Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15

Tana L. Coates, Judge
Superior Court County of San Luis Obispo

_____

Rains Lucia Stern St. Phalle & Silver, Michael L. Rains, Richard A. Levine, and Gidian R. Mellk, for Appellant.

Rita L Neal, County Counsel, Jenna Morton, Chief Deputy, for Respondent County of San Luis Obispo.

Simas & Associates, Steven L. Simas, Paul M. Bielaczyc, and Ryan M. Keever, for Respondent County of San Luis Obispo Civil Service Commission.